**Georgette Cerra REILLY, Individually and on Behalf of her minor child, Gerald Reilly, III, et. al., Plaintiffs**

v.

**GOULD, INC., (Properly known as Gould Electronics, Inc.) Defendant.**

**Civil Action No. 3:CV–95–1525.**

United States District Court, M.D. Pennsylvania.

May 28, 1997.

---

Arnold Levin, Philadelphia, PA, Thomas J. Ratchford, Minora, Minora & Ratchford, Scranton, PA, Laurence S. Berman, Robert M. Unterberger, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Diane F. Beemer, Clarks Summit, PA, Gerald J. Williams, Williams & Cuker, Philadelphia, PA, Jerry S. Cohen, Richard S. Lewis, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Robert Munley, Munley, Mattise, Kelly & Cartwright, Edward G. Krowiak, Minora, Minora, Colassan & Ratchford, Scranton, PA, for plaintiffs.

G. Wayne Renneisen, Mark A. Lockett, TerriAnne Benedetto of Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, PA, for defendant.

Suzanne L. Craig, PA Dept. of Health, Office of Legal Counsel, Yvette Marie Kostelac, Harrisburg, PA, for Department of Health.

### MEMORANDUM AND ORDER

CONABOY, Senior District Judge.

Presently before the Court are the motions of the defendant, Gould Electronic, Inc. (hereinafter "Gould"), to dismiss the class action allegations and to dismiss other substantive counts of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 5), the plaintiffs' motion and memorandum for class action determination (Doc. 15), and Gould's motion to declare moot, or, in the alternative, motion to strike, plaintiff's motion and memorandum for class determination, or, in the alternative, motion for stay (Doc. 18). For the reasons as set forth *infra*, we shall grant in part Gould's motion to dismiss the class action allegations and to dismiss other substantive counts of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 5) as it pertains to the plaintiffs' class action allegations and counts II and III of the plaintiffs' complaint, and deny said motion in part as it pertains to count VI and paragraph 62(g) of the plaintiffs' complaint. We shall also grant Gould's motion to declare moot, or, in the alternative, motion to strike, plaintiff's motion and memorandum for class determination, or, in the alternative, motion for stay, (Doc. 18), and shall thereby deem as moot the plaintiffs' motion and memorandum for class action determination. (Doc. 15).

### FACTUAL AND PROCEDURAL HISTORY

#### Factual Background

This case is one of the many cases originating from the operations of the Marjol Battery Plant. From approximately 1962 to 1980, the Marjol Battery Company (hereinaf-

ter "Marjol") owned and operated a battery crushing and lead processing plant in the Borough of Throop, Lackawanna County, Pennsylvania (hereinafter "the site"). The site is located within a residential neighborhood. In 1980, Gould bought the site from Marjol, became the owner of the site and continued operations on the site until 1982.

As a result of the business activities at the site, the site became contaminated with lead and other hazardous materials. The leakage, seepage, runoff, emission and/or erosion of these materials had contaminated the surrounding air and groundwater, as well as the soil of the neighboring residences. In accordance with state and federal environmental departments and their policies, the site and surrounding areas has undergone and is still undergoing clean up measures in order to remedy the hazardous condition.

The plaintiffs in this action, who are present or former residents of the Borough of Throop, initiated this complaint in the Court of Common Pleas of Lackawanna County for the Commonwealth of Pennsylvania, on the basis of strict liability, general common law claims and state and federal environmental statutory law. They are seeking injunctive relief (in the form of constructive trusts for medical monitoring damages and clean up costs), monetary relief (for past clean up costs and future damages for medical monitoring, compensatory and exemplary damages and fees) and class certification pursuant to Fed.R.Civ.P. 23.

Gould moves this Court to dismiss paragraph two (2) of the Prayer for relief, Count II alleging strict liability for ultrahazardous activity, Count III alleging strict liability for abnormally dangerous activity, Count V, alleging public nuisance and paragraph 62(g) of the complaint, alleging that Gould's conduct constitutes negligence per se.

In regards to the class action allegations, the putative class contains three classes, primarily defined by the type of damage alleged to have been suffered. The class is bound by a geographical delineation.[1] The classes are defined as follows:

*Class one: residential property damage class:* These class members have suffered damage to property which is located within the class area.

*Class two: medical monitoring class:* These class members include:

(A) Children less than thirteen (13) years old as of the date of the filing of the complaint who have either lived within the class area for at least one year or been a regular visitor (spending at least five (5) hours per week in the aggregate on a regular basis) within the class area, over the course of at least one (1) year;

(B) Women presently less than forty-six (46) years old who have lived or been a regular visitor within the class area for at least one (1) year since January 1, 1962, when they were children, and the offspring of these women; and

(C) Women presently of childbearing age (ages 13 through 45 as of the date of the complaint) who presently live within the class area.

*Class three: personal injury class:* These class members are persons who have either lived within the class area for at least one (1) year or been a regular visitor (spending at least five (5) hours per week in the aggregate on a regular basis) within the class area, over the course of at least one (1) year and who have suffered deleterious health effects as a result of excess exposure to lead and other hazardous materials.

(Doc. 1, pp. 2–3, ¶¶ 3–5; pp. 15–22, ¶¶ 49–59). Counsel for plaintiffs state that they do not know the exact size of the class, but believe that the number is in excess of 1,000 persons.

---

1. The class area is geographically defined as follows:

The class area is bounded by a line starting at the intersection of the Lackawanna River and the northern boundary of the Borough of Throop, extending south along the Lackawanna River to Boulevard Avenue, continuing south to Pancoast Street, following Pancoast Street to Jones Street, going North on Jones Street and continuing to Oleckna Street, following Sanderson Street east to George Street, following George Street north to Center Street, following Center Street east to Loftus Street, following Loftus Street north and continuing north to the boundary of the Borough of Throop, and following the Borough boundary north and west to the Lackawanna River.

By order of Court dated May 17, 1996, (Doc. 22), a case management conference was conducted in order to discuss the litigation. As a result of said conference, the Court directed the parties to conduct discovery limited solely to class issues, and to file a report with the Court addressing said findings. (Doc. 26). These reports, consisting of volumes of case law, facts, exhibits and appendices, were filed with the Court, the last of which was received on November 14, 1996. (Doc. 33).

## DISCUSSION [2]

### Standard of Review

 In deciding a motion to dismiss, all material allegations must be accepted as true and construed in a light most favorable to the non-moving party. *Truhe v. Rupell*, 641 F.Supp. 57 (M.D.Pa.1985). Because a motion to dismiss results in a determination on the merits at the earliest stage of the proceedings, the court is obligated to construe the plaintiffs complaint liberally in favor of the plaintiff. *Pittsburgh National Bank v. Welton Becket Associates*, 601 F.Supp. 887 (W.D.Pa.1985); *Sturm v. Clark*, 835 F.2d 1009 (3d Cir.1987). A complaint should never be dismissed for failure to state a claim unless the court is convinced beyond doubt that the plaintiff can prove no set of facts to support a claim which would permit a recovery. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Hooten v. Pennsylvania College of Optometry*, 601 F.Supp. 1151 (E.D.Pa.1984).

Plaintiffs believe that class certification should not be determined via a motion to dismiss, claiming that "Rule 12(b)(6) motions can only be used to challenge the sufficiency of claims pled in a complaint, and cannot be used to challenge a class action, which is a procedural device, not a claim." (Doc. 11, p. 1). Plaintiffs' counsel cites *Jenkins v. Fidelity Bank*, 365 F.Supp. 1391 (E.D.Pa.1973),

and *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), as their authority. The court in *Fidelity* did not dismiss the plaintiff's class action claim, stating that a class should not proceed unless the class is defined and that the named plaintiff is a member of the class. *Fidelity*, 365 F.Supp. at 1397. In this case, we directed the parties to conduct limited discovery in order for us to determine whether such prerequisites, among others, are present, as we were hesitant to address the class issue on the face of the pleadings. Furthermore, the *Eisen* court stated that "[i]n determining the propriety of a class action, the question is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen*, 417 U.S. at 178, 94 S.Ct. at 2153 (internal quotation and citation omitted). As discussed below, courts have deemed it appropriate to look beyond the class allegations and to look at the merits of the claim for the sole purpose of identifying the requirements of Rule 23.

 "A class is not maintainable as a class action by virtue of its designation as such in the pleadings." *In Re American Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996). It has been held that "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiffs' claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1947). Therefore, we may address the substance or merits of the plaintiffs' case in order to determine whether the requirements of Rule 23(a) have in fact been met. *See e.g., Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57

**2.** On February 7, 1996, the plaintiffs filed a motion and memorandum for class action determination pursuant to Local Rule 23.3, Local Rules of Court, M.D. Pa., (Doc. 15). Said rule indictates that within ninety (90) days after filing a complaint in a class action, the plaintiff is to move for class determination under Fed.R.Civ.P. 23(c)(1). The plaintiffs' motion was filed approx-

imately one hundred and forty-eight (148) days after the plaintiffs had filed their complaint, well outside the ninety (90) day period. While this clearly is a violation of local rules, we do not view such violation as being fatal to the proposed class. We shall therefore address the issue of class certification.

L.Ed.2d 351 (1978)(class determination involves considerations that are "enmeshed in the factual and legal issues comprising the plaintiffs cause of action"); *Castano v. American Tobacco Co.,* 84 F.3d 734, 744, n17 (5th Cir.1996)("more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits"); *D'Alauro v. GC Services Ltd. Partnership,* 168 F.R.D. 451, 454 (E.D.N.Y.1996)("the court's determination of class certification motion may involve some considerations related to the factual and legal issues that comprise the plaintiff's cause of action").

## I. SUBSTANTIVE ALLEGATIONS OF THE PLAINTIFFS' COMPLAINT

Gould contends that the plaintiffs have failed to state a claim upon which relief may be granted within Counts II, III, VI and within paragraph 62(g) of the complaint, all of which raise a claim under strict liability for ultrahazardous activity, strict liability for abnormally dangerous activity, public nuisance and negligence *per se* respectively. We partly agree.

As previously stated, this action is but one of many which were spawned by the operations of the site. Numerous actions have been initiated, many of which allege the same type of harm through the same type of claims.[3] *In Beam,* we held that the plaintiffs had failed to state a claim for strict liability for ultrahazardous and abnormally dangerous activities, as Pennsylvania courts do not recognize that the operation of a battery crushing plant is an ultrahazardous or abnormally dangerous activity. Likewise, in *Ambrogi et. al. v. Gould Inc.* civil action number 3:cv–88–1205 (M.D.Pa.), we granted Gould's similar motion to dismiss the plaintiffs' ultrahazardous and abnormally dangerous activity claims.

In the interest of promoting "evenhanded, predictable, and consistent development of legal principles", *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991), and since there has been no change in the law since our previous decisions, we find that the plaintiffs have failed to state a claim upon which relief may be granted as to Counts II and III of their complaint, that the plaintiffs have stated a claim for public nuisance, and that the plaintiffs have adequately pled negligence *per se* in such a manner which places Gould on notice of the allegation. We shall therefore grant Gould's motion in part as it pertains to Counts II and III of the plaintiffs' complaint, and shall deny Gould's motion in part as it pertains to Count VI and paragraph 62(g) of the complaint.

## II. CLASS ACTION ALLEGATIONS

Within their complaint, the named plaintiffs allege a class of over one thousand parties. Counsel for Gould contends that this action should not proceed as a class action as certain prerequisites have not been met and, therefore, the plaintiffs class allegations should be dismissed.

### A. Rule 23(a) Requirements

We state at the onset that the party seeking certification has the burden of showing that all of the requirements of Rule 23 have been met. *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 55 (3d Cir.1994); *Caruso v. Celsius Insulation Resources, Inc.,* 101 F.R.D. 530, 533 (M.D.Pa.1984).

> Fed.R.Civ.P. 23(a) states in relevant part: One or more members of a class may sue ... on behalf of all only if(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims ... of the representative parties are typical of the claims ... of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

These four (4) mandatory requirements of impracticality, commonality, typicality and representativeness must be met in order for a class action to proceed. If but one of these

---

**3.** Indeed, the complaints of the three (3) most recent actions which have been filed, *Beam. et. al. v. Gould Electronics, Inc.,* civil action number 3:cv–96–0101 (M.D.Pa.), *Aria. et. al. v. Gould Electronics, Inc.,* civil action number 3:cv–95– 2801 (M.D.Pa.), and *Reilly, et. al. v. Gould Electronics, Inc.,* civil action number 3:cv–95–1525 (M.D.Pa.) are verbatim, raising the same claims within the same count, to the extent of the class action allegations in the *Reilly* complaint.

mandatory elements is not met, then the class must fail. Class certification permits courts to treat common claims together, obviating the need for repeated adjudications of the same issues. *In Re General Motors Corp. Pick–Up Truck Fuel Tank,* 55 F.3d 768, 783 (3d Cir.), *cert. denied. sub nom, General Motors Corp. v. French,* —— U.S. ——, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). If facts are not common to the entire class and there is a need to address each party's claims individually, then a class action would not be an efficient device in doing so.

■ This class action also presents the issue of sub-classes, for there are three (3) classes alleged in this action, each claiming a specific damage. While these are sub-classes, it is common sense that all three classes must also meet the requirements of Rule 23(a) and (b) *Retired Chicago Police Association v. City of Chicago,* 7 F.3d 584, 599 (7th Cir.1993).

■ In addition to these required elements, a proposed class must be able to meet one of the three (3) requirements of Rule 23(b).[4] It is important to understand that the requirements of Rule 23(a) and Rule 23(b) serve two important but equally different purposes. While the Rule 23(a) requirements specifically address "due process considerations and exist so that absent class members may be bound by the resulting class action judgment in accordance with due process ", *Liberty Lincoln Mercury v. Ford Marketing,* 149 F.R.D. 65, 73 n. 15 (D.N.J. 1993) (citations omitted), the requirements of Rule 23(b) "are designed to test whether ... from a practical standpoint, there are any particular compelling circumstances which make representative litigation appropriate."

*Id.* (internal quotations and citations omitted).

■ It is also equally important to state that even before Rule 23 is satisfied, there must actually be an identifiable or definable class. *Daigle v. Shell Oil Co.,* 133 F.R.D. 600, 602 (D.Colo.1990). Gould contends that there is no identifiable class, as the class is defined by geographical boundaries, and cites the *Daigle* case as its support.

In *Daigle,* the court exercised its discretion and declined to certify a class for personal injury and property damage said to have been caused by the defendants' clean up activity at a toxic waste disposal pond. The *Daigle* court held that there was no definable class, as the class was defined by geographical boundaries and not by the actions of the defendants. This case before us now is distinguishable from the *Daigle* case, for the putative class here is identified by the actions of the site. The boundaries merely establish and limit the class members; the class itself, however, is "defined by the activities of the defendants," *Daigle,* 133 F.R.D. at 602, those being the operations of the site. We therefore disagree with Gould's contention that no definable class exists.

This class action can be summed up in two words: discretion and disparity. Discretion, for it is within our province to certify the class, *Neal,* 151 F.R.D. at 282; and disparity, for the claims and injuries of the plaintiffs are affected by different factors, thereby making individual facts predominate over the common facts of the entire class. Because there are multiple facts which effect the plaintiffs' claims, we feel the need to address each element of both sub-parts of Rule 23 *seriatim.*

4. Rule 23(b) states in relevant part:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of:

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the opposing class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect these interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class is superior to other available methods for the fair and efficient adjudication of the controversy....

### 1. *Numerosity*

■ Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. We recognize that at the time of alleging a class, no specific number of class members is required. *Caruso,* 101 F.R.D. at 533. Therefore, "[c]ourts are ... called upon to use their common sense in determining whether a particular class of plaintiffs is too large to be joined or to be required to bring separate actions." *Hurt v. Philadelphia Housing Authority,* 151 F.R.D. 555, 559 (E.D.Pa.1993); *Bradley v. Harrelson,* 151 F.R.D. 422, 426 (M.D.Ala.1993). Because of this, our common sense dictates that an estimated class of over 2,000 members meets the numerosity requirement.[5]

However, if this class were certified, the location of the site (being uphill) and factors such as water migration, wind and run off could create the difficulty of ascertaining members of the class. *See e.g. Brown v. Southeastern Pennsylvania Transportation Authority,* 1987 WL 9273 at * 8 (E.D.Pa.1987)(*citing* H. Newberg and A. Conte, 3 NEWBERG ON CLASS ACTIONS, § 17.08 (2d d.1985) at 374 n. 66)(size of class may be difficult to ascertain because contamination may depend on various factors such as wind).

### 2. *Commonality*

■ "Rule 23(a)(2) does not require that all questions of law or fact raised in the litigation be common. The test or standard for meeting the Rule 23(a)(2) requirement is qualitative rather than quantitative-that is, there need only be a single issue common to all members of the class." H. Newberg and A. Conte, 1 NEWBERG ON CLASS AC-

TIONS, § 3.10 at 48–50 (3d Ed.1992). Since commonality may be found in one common question of law or fact, it is easily met. *See Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994)(where the court stated that a demonstration that the class members are subject to the same type of harm is a sufficient showing of commonality).

■ "In mass tort actions, the requirement of common questions has been satisfied by a showing of commonality either as to liability! ... or as to the cause or impact of the tortious action." *In re Asbestos School Litigation,* 104 F.R.D. 422, 429 (E.D.Pa.1984) (internal quotations and citations omitted). In this case, it is the operation of the site that has given rise to this litigation. It is clear that the issue common to all plaintiffs is that they have been exposed to operations at the site. However, it is not that easy to state the commonality exists.

■ The Third Circuit has recently commented that cases in which it had stated that the commonality requirement has a low threshold are factually different from mass tort cases. This is due to the fact that the prior rulings dealt with situations in which there were "fewer individualized questions."[6] *Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 627 (3d Cir.), *cert. granted, sub nom, Amchem Products, Inc. v. Windsor,* —— U.S. ——, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996).[7] The court continued by stating that although it believed that the commonality requirement is higher "in a personal injury damages class action ... that seeks to resolve *all* issues, including non-common issues of liability and

---

**5.** At the time of filing the complaint, the class size was estimated at over 1,000 members of the class. In their discovery reports, plaintiffs' counsel re-estimated the amount of class members to be approximately 2,000. (Doc. 28, p. 2). This estimate was derived from a demographic analysis of the proposed class area, as well as the 1990 census report. Plaintiffs' expert, Dr. Andrew Verzilli, reported that there were 1,901 persons living within the class area in 1990 (Doc. 28, Exh. A, p. 2). This number was then adjusted to 2,000 in order to compensate for the visitors to the class area. (*Id.*).

**6.** These cases dealt with classes for injunctive relief, *Baby Neal for and by Kanter v. Casey,* 43

F.3d 48 (3d Cir., 1994), and for property damages. *In re School Asbestos Litigation* 789 F.2d 996 (3d Cir.), *cert. denied, sub nom, Celotex Corp. v. School District of Lancaster,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986).

**7.** On November 1, 1996, the United States Supreme Court granted *certiorari* in the *Georgine* case to discuss the specific issue of whether a trial court, in certifying a class for settlement purposes, must find that all of the elements or Rule 23 must be met. *Amchem Products, Inc. v. Windsor,* —— U.S. ——, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996).

damages," *Id.*, it declined to establish a higher threshold of commonality in personal injury or mass tort class actions where the class encompasses all issues. We agree with this statement. The determination as to whether factual differences among class members defeats certification is best left to be discussed in the realms of the typicality and predominance elements of Rule 23(a)(2) and 23(b)(3), and should not be addressed via a court imposed heightened standard of commonality.

Even in light of this, commonality does not exist here. True, all plaintiffs are said to have been exposed to lead emission from the site, but whether and to what extent the emissions are said to have affected each class member is not common to all involved. Furthermore, assuming *arguendo* that the plaintiffs possess common claims which contain common issues of law or fact, such issues are altered or changed by the individual facts and situation of each plaintiff. This destroys anything common to the class.

### 3. *Typicality*

 "Typicality entails an inquiry into whether the named plaintiff's individual circumstances are markedly different or the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Hassine v. Jeffes,* 846 F.2d 169, 177 (3d Cir.1988)(quotations and citations omitted). *Accord, Killian v. McCulloch,* 873 F.Supp. 938, 945 (E.D.Pa.1995), *aff'd, sub nom, Stadler v. McCulloch,* 82 F.3d 406 (3d Cir.1996)(table); *Neal,* 43 F.3d at 57–8. "The typicality requirement is intended to preclude certification of those cases where the legal theories conflict with those of the absentees ", *Georgine,* 83 F.3d at 631, and "to assure that the absentees' interests will be fairly represented." *Neal,* 43 F.3d at 57.

The named class representatives, Georgette Cerra Reilly, acting individually and on behalf of her minor child Gerald Reilly III, and Diane O'Keefe, acting individually and on behalf of her minor children Danielle

Hutchins and Estavon Hutchins, purport to represent over 2,000 potential claimants. As pled within the complaint, all five (5) representatives are said to be members of Class II, the medical monitoring class, and all but Gerald Reilly, III, are members of Class III, the personal injury class. (Doc. 1. pp. 3–4, ¶¶ 7–8). Furthermore, Georgette Reilly and Diane O'Keefe purport to represent the members of Class I, residential property damage class.

In an effort to analyze the factual differences among the plaintiffs, counsel for Gould compiled a database of past and present plaintiffs who have either settled claims with or have claims currently pending against Gould. Not only is this database highly impressive, but it also is an invaluable document in our determining class certification. The database lists past and present plaintiffs, and sets forth their current and past addresses, the total amount of time spent in Throop by each person, how far their residence is from the site, whether the property was remediated (and if so, in what year), and the level reading of lead in the soil. This database also indicates the gender, age and blood and bone lead levels of the person. (Doc. 31).

### (a) residential property damage representatives

Class discovery reveals that Georgette Reilly's Throop residence was six blocks, or 1,200 feet, from the site, (Doc. 30, Exh. C, p. 3; Doc. 31, p. 67)[8], and that, in 1988, her residence had a lead soil reading of zero parts per million (hereinafter "ppm"). (Doc. 31, p. 67). No permission was ever given to test her residence for either interior lead readings or for lead soil testing. (Doc. 30, Exh. B, p. 54).[9] Diane O'Keefe's Throop residence is located 600 feet from the site and in 1988, that residence had a lead soil reading of seven-hundred and seventy (770) ppm. (Doc. 31, p. 58).

A random sampling of residents taken from the database reveals that other mem-

---

**8.** Although Georgette Reilly no longer resides in Throop she is a property owner in Throop, having bought her house from her mother in 1994. (Doc. 30, Exh. B, pp. 2–3).

**9.** This may account for the lead soil reading on zero ppm.

bers who fall within the geographical boundaries have varying levels of lead in their soil, apparently due to varying distances from the site. For example, while the average soil lead reading from residences 100 feet from the site was 2,878 ppm, the average soil lead reading from residences 2,000 feet from the site was 637 ppm. (Doc. 29, fig. no. 6). However, while the average soil lead reading from residences 1,000 feet from the site was 1,020 ppm, the average soil lead reading from residences 1,200 from the site was 1,425 ppm. (*Id.*). These average soil readings could also be controlled by the fact of whether the property was remediated by Gould. Such readings indicate that there is no set correlation between a high lead soil reading and proximity to the site.

### (b) Personal Injury Representatives

In regards to Class II, the personal injury class, it is necessary to educate oneself on the types of deleterious health effects attributable to lead exposure. In support of class certification, plaintiffs' counsel submits the report of Dr. John Rosen, (Doc. 28, Exh. C), head of the Division of Environmental Sciences at Montefiore Hospital in New York, where the primary focus is on clinical research in childhood lead poisoning. (*Id.* at p. 1).

Dr. Rosen states in his report that a database exists which provides "a direct link between low level lead exposure in young children and deficits in neurobehavioral-cognitive performance manifested later in childhood through adolescence." (*Id.* at p. 4). Additionally, any IQ deficits said to have been incurred because of lead poisoning "have been found to be irreversible." (*Id.* at 5). Advisory groups and federal agencies "have [therefore] redefined lead poisoning as a [blood lead level] equal or greater than 10 ug/dl [micrograms of lead per deciliter of blood]." (*Id.*). Dr. Rosen also indicates that an affected child could suffer from loss of IQ points or deficits in comprehension, attention, motor skills, vocabulary and language development, as well as abstract thinking, daily living skills and/or math, reading and writing performance.

In adults, typical symptoms of lead toxicity include hypertension, headaches, behavior changes, irritability, depression, apathy, anorexia, peripheral polyneuritis [10] affecting sensory and motor nerves, kidney disease or malfunction, anemia and demyelination [11]. (*Id.* at 10). In male adults, excessive blood exposure at levels equal to or greater that 40 *ug*/dL could lead to reproductive incompetence, asthenospermia, and sperm count suppression. (*Id.*).

Child representatives Danielle Hutchins and Estavon Hutchins claim to have tendencies attributable to deficit disorder. (Doc. 30, Exh. C, p. 32). However, such tendencies were not clinically diagnosed, and there is "nothing official" which leads Diane O'Keefe to believe that her children actually suffer from attention deficit disorder. (*Id.* at pp. 32–3). Danielle Hutchins has made the honor roll system in high school, after having been placed in remedial courses in grade school. (*Id.*) Physically, her health is in good condition. (*Id.* at p. 28). Estavon Hutchins has been enrolled in remedial courses during her matriculation. (*Id.* at p. 29). In regards to Gerald Reilly, III, class discovery yields that he was born with malrotation of the intestines, a blockage of the intestines. (Doc. 30, Exh. B, p. 39). This problem was remedied by surgery, (*Id.*), and no physician had advised the family that this problem was attributable to lead exposure. (*Id.* at 41). He has never resided in Throop, (Doc. 30, Exh. B, p. 39), but occasionally visits "maybe twice a week" relatives who presently reside in Throop. (*Id.* at 41).

Georgette Cerra Reilly testified at her deposition that she suffers from anemia, (*Id.* at 48), and has no heart or lung problems of which she is aware. (*Id.* at 49). She does state, however, that she suffers from back pain and a sore ankle, (Doc. 30, Exh. B, p. 55), but that no physician has told her that

---

**10.** Peripheral polyneuritis is the simultaneous inflammation of a large number of the spinal nerves, marked by pain, paralysis and wasting of muscles. STEDMAN'S MEDICAL DICTIONARY (5th Ed.).

**11.** Demylelization is the destruction or loss of mylein (the protective plasma membrane) which envelopes the axon or nerve cell. *Id.*

such conditions are attributable to lead exposure. (*Id.*).

Diane O'Keefe is in good health, except for arthritis, which she treats with aspirin. (Doc. 30, Exh. C, p. 38). She further states that she "has no idea" whether she has any medical symptoms or ailments attributable to lead exposure. (*Id.* at 40).

■ Although typicality measures the sufficiency of the named plaintiff, it does not require that "all putative class members share identical claims." *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir. 1994). Of equal importance is the fact that typicality is also intended "to screen out class actions involving legal or factual positions of the class representative which are markedly different from those of other class members." *Liberty Lincoln Mercury v. Ford Marketing,* 149 F.R.D. 65, 77 (D.N.J.1993).

■ We find that typicality is lacking in this case. Although the named representatives purport to have the same type of claims as the other class members, it is evident that the factual disparity among the plaintiffs' claims defeats typicality. This case presents a hodge-podge of factually and legally different issues dispersed among different plaintiffs. *See Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 632 (3d Cir.), *cert. granted, sub nom, Amchem Products Inc. v. Windsor,* —— U.S. ——, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996) (where the Third Circuit held that since there were both present and future injury plaintiffs in the class, the future injury plaintiffs' interests and incentives were in conflict with the representatives). A named plaintiff's claim may be adversely affected by facts which may prove to be helpful to another. Not only is this true for the members of the property damage class, but it is especially true for the medical monitoring class.

### 4. *Representativeness*

■ In order for representativeness to exist, courts must determine "that the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class," *Hassine v. Jeffes,* 846 F.2d 169, 179 (3d Cir.1988). The burden of proving inadequate representation lies with the defendant. *In Re Asbestos School Litigation,* 104 F.R.D. 422, 430 (E.D.Pa.1984).

■ Because there is no typicality, we conclude that representativeness is also lacking in this matter. Representativeness is not appropriate where the named plaintiffs have different claims and/or circumstances than other members, thereby creating the possibility of a less than vigorous advancement of the case for all plaintiffs involved.

Following the reasoning of the *Georgine* court, while all members of Class III bring a claim for medical monitoring damages, not all may succeed on that claim. While the named representatives may succeed, other members may not, and vice versa.[12] Furthermore, some members of the property damage class may or may not have had their residences remediated. Such facts create the appearance of internal class strife. Therefore, "[i]t is simply impossible to say that the legal theories of named plaintiffs are not in conflict with those of the absentees, or that the named plaintiffs have incentives that align with those of absent class members." *Georgine,* 83 F.3d at 633.

■ Gould also contends that a conflict is present among the plaintiffs' counsel, since most of the counsel who represent the plaintiffs in this matter have also represented other Throop plaintiffs in prior actions against Gould for the same claims. While we recognize that there have been disputes among plaintiffs' counsel in the past, see Ray Flanagan, *Lead Contamination Suit Settlement Spawns Lawyers Feud,* THE SUNDAY TIMES, July 7, 1996 at p. B1, we are also of the opinion that this issue would not have created an insurmountable problem had this class been certified.[13] Additionally, we

---

12. We decline comment on whether each plaintiff may succeed on the merits of their claim, for it is not within our province to do so at this juncture.

13. We have been, and continue to be, impressed with the professional performance of all counsel involved in the Gould actions. While we have

do not believe that the fact that plaintiffs' counsel had initiated identical litigation in the past bears any negative impact on their present ability to represent the plaintiffs in this action. See H. Newberg and A. Conte, NEWBERG ON CLASS ACTIONS,. § 9.35 at 9–94 (3d Ed.1992)("No conflict arises when the class action and individual litigation proceed in parallel").

## B. Rule 23(b) Requirements

### 1. *Rule 23(b)(1): inconsistent adjudications*

As previously stated, in addition to all the requirements of Rule 23(a) being met, the putative class must also meet one of the requirements of Rule 23(b). This class has moved for certification pursuant to Rules 23(b)(1), 23(b)(2) and 23(b)(3). We find that the class fails to meet any part of Rule 23(b).[14]

■ In regards to Rule 23(b)(1), a class action may be maintained if the prosecution of separate actions would create the risk of either inconsistent or varying adjudications with respect to the individual members of the class, Fed.R.Civ.P. 23(b)(1)(A), or if adjudications with respect to the individual members would be dispositive of the interests of other parties who are not members of the class. Fed.R.Civ.P. 23(b)(1)(B). This is not the first group of plaintiffs who have initiated an action against Gould. We first addressed a group of plaintiffs in 1988 in the *Ambrogi* action, which comprised of approximately 327 plaintiffs. (Doc. 29, p. 14). After lengthy discovery process, and on the eve of trial, this case ended in settlement. However, prior to settlement, we addressed several issues, including but not limited to discovery of results of medical tests performed on the plaintiffs and the merits of certain claims. Similarly, currently pending before the Court are several other actions which have been brought by present or former residents of Throop. Collectively, these pending cases

present approximately 396 plaintiffs to the Court. Throughout the entire litigation history of the site, the Court has been ever mindful of its prior rulings, and has adhered to said rulings when appropriate and when there has been no change in case law. It is clear, then, that prosecution of separate actions would not create the risk of either inconsistent or varying adjudications with respect to the individual members of the class.

### 2. *Rule 23(b)(2): defendant's actions towards the plaintiffs*

■ We touch briefly on Rule 23(b)(2) for purposes of completeness, as the plaintiffs have moved for certification pursuant to Rule 23(b)(1), (2) and (3). As plaintiffs' action is one essentially for damages and not injunctive relief, "[o]ur Court of Appeals has expressly denied certification under 23(b)(2) when the requested relief 'relates exclusively or predominantly to money damages'" *Brown v. Southeastern Pennsylvania Transportation Authority,* 1987 WL 9273 (E.D.Pa. 1987) at *12 (quoting *In Re School Asbestos Litigation,* 789 F.2d 996, 1008 (3d Cir.1986)).

### 3. *Rule 23(b)(3): predominating individual facts*

■ Rule 23(b)(3) dictates that a class action may be maintainable if the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting the individual members. "Subdivision (b)(3) parallels (a)(2) in that both require that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues." *In Re American Medical Systems, Inc.,* 75 F.3d 1069, 1084 (6th Cir.1996)(citing H. Newberg & A. Conte, 1 NEWBERG ON CLASS ACTIONS, § 3.10 (3d Ed.1992) at 3–56). "The court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the

---

always expected nothing less than adequate performance from counsel, we have always received above average performance from all counsel.

**14.** We feel the need to address Rule 23(b), even though Rule 23(a) has not been met, for Rule 23(b) is the heart of the reason why this class is not being certified.

questions affecting individual members. It is only where this predominance exists that economies can be achieved by means of the class action device." Advisory Committee Note to 1966 amendment, *as reprinted in* 39 F.R.D. 98, 103 (1966).

Counsel for plaintiffs state that mass tort actions are amenable to class action. While this is true in certain circumstances, it is also true that the plaintiffs' claims in such actions could vary among themselves due to individual facts which control or affect each plaintiff. The Advisory Committee Note to the 1966 revision of Rule 23 also suggests this concern. *See id.* ("A mass accident resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action would degenerate in practice into multiple lawsuits separately tried").

In · *Sterling v. Velsicol Chemical Corp.,* 855 F.2d 1188 (6th Cir.1988), the Sixth Circuit held that the district court did not abuse its discretion in certifying a class in a mass tort action. In a case somewhat similar to ours, several persons who either lived or owned property near the defendants' landfill initiated suit for personal injuries and property damage as a result of exposure to hazardous chemical leaks from the plant. The class was certified as a Rule 23(b)(3) class. On appeal, the court upheld class certification, and held that the district court did not abuse its discretion in certifying the class. In ruling so, the *Sterling* court commented on certification of mass tort class actions:

> [T]he problem of individualization of issues is often cited as a justification for denying class action treatment in mass tort accidents. While some courts have adopted this justification in refusing to verify such accidents as class actions, numerous other courts have recognized the increasingly insistent need for a more efficient method of disposing of a large number of lawsuits arising out of a single disaster or a single course of conduct. In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next. . . . Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible. . . . **In complex, mass, toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving controversy.** However, where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy.

*Sterling,* 855 F.2d at 1196–7 (internal citations omitted)(emphasis added).

The facts of the *Sterling* case are distinguishable from ours. Although the plaintiffs in *Sterling* had lived in the vicinity of the landfill and suffered damages due to the landfill operations, the court noted that "[t]he single major issue distinguishing the class members is the nature and amount of damages ... each sustained." *Id.* at 1197. In this case, it is the presence of additional individualized factors affecting individual plaintiffs which wreaks havoc on the notion that all plaintiffs' injuries have been caused solely by the defendant's actions. The *Sterling* court also questioned the appropriateness of a class action in such a situation, and with this we agree.

This Court has followed such reasoning when faced with putative classes in mass tort actions. In *In Re Three Mile Island Litigation,* 87 F.R.D. 433 (M.D.Pa.1980), Judge Sylvia Rambo declined to certify a putative class where the class was one for personal injury and emotional distress because there would have to be an individual determination of proof for each plaintiffs' injury. In Judge Rambo's opinion, this would, in turn, split the class into separate actions. *In Re Three*

*Mile Island Litigation,* 87 F.R.D. at 441–442. Furthermore, in *Kuhn v. Skyline Corp.,* civil action no. 2:cv–83–942 (M.D.Pa.1983), Judge Rambo noted that although the court certified a sub-class in the TMI litigation for medical monitoring damages, that class would have been decertified had the action not settled.

■ Additionally, in *Kuhn,* the court declined to certify the class due to the fact that there would be "a plethora of other individual factors which would have to be considered." *Id.* at 7–8. We agree with Judge Rambo in her well reasoned analysis. Although there is one common fact among the plaintiffs—that there was widespread lead exposure due to the operations of the site—there is "a plethora of other individual facts which affect each of the plaintiffs' claims." Such facts, in turn, could cast doubt on the issue of proof or causation.

Although it is well established that the Marjol Battery Plant dealt primarily in the reclamation of lead from spent batteries and that the manner in which this was achieved may have caused the release of lead into the environment, it has also been pointed out by defendant's counsel that there are other prevalent sources of lead emission. The Centers for Disease Control reports that "[m]any factors can affect the absorption, distribution, and toxicity of lead." William Roper, PREVENTING LEAD POISONING IN YOUNG CHILDREN: A STATEMENT BY THE CENTERS FOR DISEASE CONTROL, U.S. Department of Health and Human Services (1991) at 11 (hereinafter "CDC report"). (Doc. 30, Exh. L, p. 11). To support its contention that individual facts predominate over facts common to the entire class, Gould submits to the Court this CDC report which sets forth the various ways individuals are exposed to lead, and how such exposure varies from person to person.

### (a) lead based paint

The CDC report states that lead based paint is a major source of high-dose lead poisoning, and despite the fact that the Consumer Products Safety Commission began to limit the lead content of residential paint in 1978, many houses still contain lead-based paint.[15] (*Id.* at 12). Lead based paint was widely used from the 1940s until the 1970s, has been associated with blood lead in children, and can be ingested via dust or paint chips contaminated with lead from paint which has been disturbed due to home renovation. (*Id.* at 18). Because of this, the Centers for Disease Control states that children living in homes undergoing renovation "are at particular risk for lead poisoning." *Id.* A 1989 report to Congress indicates that there are an estimated 42 million dwelling units in the United States which contain leaded paint at levels exceeding the prior CDC threshold exposure of .07 mg Pb/cm. Mushak and Crocetti, DETERMINATION OF NUMBERS OF LEAD–EXPOSED AMERICAN CHILDREN AS A FUNCTION OF LEAD SOURCE: INTEGRATED SUMMARY OF A REPORT TO THE U.S. CONGRESS ON CHILDHOOD LEAD POISONING (1989) at 214. (Doc. 30, Exh. M p. 4).

Gould's database reveals that most of the plaintiffs' homes are older structures, many of which may not have been renovated. The CDC report indicates that homes built before or around 1960 are of greatest concern. (Doc. 30, Exh. N, p. 40). Gould states that from information already available, it has been able to identify 41 homes which are located within the class boundary and were built before 1960. (Doc. 29, p. 58).

### (b) lead based gasoline

It has also been established that lead emission has occurred in large amounts via leaded gasoline. From the 1920s to the 1980s, lead was used as an additive to gasoline. Committee on Measuring Lead in Critical Populations, MEASURING LEAD EXPOSURE IN INFANTS, CHILDREN, AND OTHER SENSITIVE POPULATIONS (1993) at 118. (Doc. 30, Exh. M, p. 118) "Environmental lead contamination from combustion of leaded gasoline has been widely documented in the United States ... and there is much evidence that it had added substantially to the body lead burdens of affected human populations." *Id.* Once the Environmental

---

**15.** Even Dr. Rosen, the plaintiffs' expert, had testified in a prior unrelated action that lead found in housing is an overwhelming source of childhood lead poisoning. (Doc. 30, Exh. O).

Protection Agency began to regulate the lead emissions of gasoline, there occurred a parallel decline in the average blood lead concentration of the U.S. population. *Id.* at 120. Although regulations are in effect today, a problem still exists due to the fact that large amounts of deposited lead remain in the environment. *Id.*

While this report indicates that lead exposure does occur at the work environment and that some of the most common work environments where this occurs are the storage of batteries and the business of both wet and dry primary batteries, *Id.* at 22, we cannot ignore the fact that such circumstances play an important role in the issue of causation and the extent of liability. The possibility that some class members could have been exposed to lead from other origins results in the need for an individual and highly factually intensive analysis of all plaintiffs involved in this action.

### (c) individual tolerance to lead absorption

In an unrelated matter, Dr. Rosen testified that a rule of thumb has evolved concerning susceptibility to lead exposure. That rule is that "the younger the child, the more susceptible and that the general range of the most susceptible children to toxic effects of lead is roughly 15 to 48 months of age." (Doc. 30, Exh. Z, p. 2). The CDC report also indicates that children have a higher lead absorption rate than adults, (Doc. 30, Exh. O, p. 11), and even among children, those between the ages of six to seventy-two months who are exposed to deteriorated buildings are in a higher priority group than other children. (*Id.* at 40).

In regards to adults, Dr. Rosen states that females of child-bearing age should be cautioned concerning the risk of becoming pregnant, (Doc. 30.Exh. V, p. 1), and that adult males are at an increased risk for hypertension during middle age adult life. (*Id.*). Females in their adult years have a higher risk of re-distributing lead to other organs if they develop osteoporosis. (*Id.*). While female children are more susceptible to exposure in their postnatal years, male children are more susceptible to prenatal affects of lead. (Doc. 30, Exh. W, p. 1).

In another unrelated matter, Dr. Rosen also testified that the effect that lead has on a child not only is dependent on the age at the time of ingestion, but also is dependent on the amount of lead ingested and the duration of ingestion. (Doc. 30, Exh. Z, pp. 1–2).

While such statistics indicate that the class members may be susceptible to lead exposure, the extent and tolerance of such exposure will vary, depending upon the age and sex of the party. This is another reason why all the plaintiffs' claims must be addressed individually.

### (d) house remediation

Another factor which dictates an individual factual analysis of the plaintiffs' claims is house remediation. Pursuant to the Consent Order entered into by Gould and the United States Environment of Protection Agency, certain homes were remediated. Such remediation entailed the removal and replacement of top soil, shrubs, grass, trees and bushes, as well as house cleaning and carpet replacement. (Doc. 29, p. 23). Gould indicates that 84 homes were remediated within the proposed class area and within 1,200 feet of the site. (*Id.* at 23–4). While three (3) out of ten (10) residences within a three hundred feet distance were remediated, 24.5% of the residences within one thousand feet of the site were not remediated. (*Id.* at 24).

The above mentioned reports indicate that the presence of lead in soil and the household affects the extent of lead ingestion. Once again, since the presence of lead in some residences had been reduced due to the remediation process, this fact will play a role in determining the amount and length of exposure for the class members who reside in remediated residences.

### (e) blood and bone lead levels

Class discovery reveals that the blood and bone lead levels for class members vary depending upon the distance . from the site. However, there is no set correlation between a high lead level and proximity to the site, due to fact that certain residences are upwind and uphill from the site. For example, while one male resident who lived 3,500 feet

from the site had a blood lead measurement of 76 *ug*/dL in 1976, (Doc. 29, p. 27), another male resident who lived three hundred feet from the site had a blood lead measurement of 21 *ug*/dL. (Doc. 31, p. 62). And while the highest bone lead measurement was of a resident who lived within one hundred feet from the site, other individuals who lived within that distance had levels ranging from 7 *ug*/dL to 129 *ug*/dL. (*id.* at 29).

The above disparate facts indicate that we cannot apply a blanket analysis to all class members. Gould's counsel properly argues that "[t]he preceding analysis demonstrates that the Marjol impact must be analyzed property by property and individual by individual. Generalizations concerning a uniform effect from lead exposure are not appropriate." (*Id.* at 31).

The fact that such other factors must be taken under consideration, precludes certification. *See Commonwealth of Puerto Rico v. M/V Emily S*, 158 F.R.D. 9, 14 (D.Puerto Rico 1994)(the fact that each person's susceptibility to injury from oil vapors would vary with factors of, inter alia, age and sex and that certain ailments of the class members could have been caused by factors other than such exposure precluded class certification); *Boring v. Medusa Portland Cement Co.*, 63 F.R.D. 78, 84 (M.D.Pa.1974)(the fact that there may be more than one source of contamination, compounded by the fact that the plaintiffs are located at different distances from the source of contamination precluded class certification); *Newton v. Southern Wood Piedmont Co.*, 163 F.R.D. 625, 633 (S.D.Ga.1995), *aff'd*, 95 F.3d 59 (11th Cir.1996)(table)(inquiries into the plaintiffs medical history, method and length of exposure in order to determine class eligibility precluded class certification).

We also note that because of the potential inability to manage the class, and because each plaintiff's claim must be given individual attention, class status is not the superior method of litigation. *See e.g. In Re American Medical Systems, Inc.*, 75 F.3d 1069, 1085 (6th Cir.1996)(mandamus issued to decertify a products liability class where individual cases could focus on specific issues of each plaintiff).

### 4. *Other Pertinent Factors*

█ Rule 23(b)(3) also permits courts to consider other factors when determining whether an action should be maintained as a class. Among such factors are the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, Fed.R.Civ.P. 23(b)(3)(B), and the difficulties likely to be encountered in the management of a class action. Fed.R.Civ.P. 23(b)(3)(C). These additional factors come into play here.

### (a) prior litigation

"Under Rule 23(b)(3)(B), a court must consider whether there is any litigation concerning the controversy already commenced by or against members of the class." *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 680 (N.D.Ohio 1995)(internal quotation and citation omitted). All parties are well aware of the vast amount of litigation which has been initiated due to the site's operations. This Court has efficiently managed past and present consolidated individual actions containing several hundred parties. We have been able to effectively maintain and manage these actions. While there has been considerable work in managing these actions, when any difficulties arose, we have been able to address them in an orderly fashion. However, we are doubtful as to whether such treatment could be had if this action were to proceed as a class.

While our comment on other individual actions could be taken as an argument for class certification, it must be noted that it is not the quantity, but rather the nature of the actions which leads us to conclude that this action is not suitable for class treatment. And the nature of those cases and the claims therein warrant an individual analysis of the plaintiffs involved in order to assure that all plaintiffs' claims are given appropriate attention.

### (b) manageability of the class

The manageability consideration of Rule 23(b)(3) "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417

U.S. 156, 164, 94 S.Ct. 2140, 2146, 40 L.Ed.2d 732 (1974). Again, due to the fact that different issues affect the plaintiffs' claims, manageability of this proposed class would be extremely difficult. Instead of addressing all claims in an efficient manner, we would have to basically pick apart the class member by member, taking into consideration circumstances applicable only to that plaintiff. This in essence would partition the entire class into individualized actions, and would create mismanagement of the class.

We are also concerned with the manner in which the class has been presented to the Court. While the proposed structure of the three classes may at first glance seem logical, a more in depth analysis reveals that the class definitions may be tenuous. For example, the fact that the plaintiffs include in their classes all regular visitors who have spent at least five (5) hours per week in the aggregate on a regular basis, the possibility of any large number of such visitors, and the regulation of them within the class, could pose a significant problem in class management.

## *CONCLUSION*

Based upon the foregoing, we shall grant in part Gould's motion to dismiss the class action allegations and to dismiss other substantive counts of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 5) as it pertains to the plaintiffs' class action allegations and counts II and III of the plaintiffs' complaint, and deny said motion in part as it pertains to count VI and paragraph 62(g) of the plaintiffs' complaint. We shall also grant Gould's motion to declare moot, or, in the alternative, motion to strike, plaintiff's motion and memorandum for class determination, or, in the alternative, motion for stay, (Doc. 18), and shall therefore deem as moot the plaintiffs' motion and memorandum for class action determination.[16] (Doc. 15). An appropriate order is attached.

---

**16.** We have, of course, fully considered the arguments in all the plaintiffs' motions and supporting memoranda.

ORDER

AND NOW, THIS 28TH DAY OF MAY, 1997, IT IS HEREBY ORDERED THAT:

1. Gould's motion to dismiss the class action allegations and to dismiss other substantive counts of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 5) is **GRANTED IN PART** as it pertains to the plaintiffs' class action allegations and counts II and III of the plaintiffs' complaint, and **DENIED IN PART** said motion in part as it pertains to count VI and paragraph 62(g) of the plaintiffs' complaint.
 (a) Said motion is GRANTED IN PART as it pertains to Count II and III and the plaintiffs' class action allegations. The plaintiffs' claims for strict liability for ultrahazardous activity and for abnormally dangerous activity are **dismissed.** The plaintiffs' claim for class action treatment is **dismissed.**
 (b) Said motion is DENIED IN PART as it pertains to Count VI and paragraph 62(g) of the complaint.
 (c) Paragraph 2 of the plaintiff's prayer for relief is **dismissed.**
2. By this memorandum and order, we have determined that the putative class has failed to meet the basic prerequisites of Rule 23 and its subparts in order to proceed as a class, and that this action is to proceed as an individual action.
3. By this memorandum and order, we have also determined that the plaintiffs have failed to state a claim based upon strict liability for ultrahazardous activity and abnormally dangerous activity and that the plaintiffs have stated a claim for public nuisance and have plead negligence *per se* at paragraph 62(g) of the complaint in such a manner which places defendants on notice of such a claim.
4. Gould's motion to declare moot, or in the alternative, motion to strike, plaintiff's motion and memorandum for class determination, or, in the alternative, motion for stay (Doc. 18) is **GRANTED.**

5. The plaintiffs' motion and memorandum for class action determination (Doc. 15) is declared **MOOT**.

6. The CLERK of COURT is DIRECTED to MARK the DOCKET SHEET accordingly.