**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 13 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

LARRY LEONHARDT, DAN
LAURSEN, and RICK RODRIQUEZ,
RODRIQUEZ FARMS, INC.,

        Plaintiffs - Appellants,

    v.

WESTERN SUGAR COMPANY, a
corporation,

        Defendant - Appellee.

No. 97-8078

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. NO. 97-CV-46-D)**

---

Michael J. Heaphy (John M. Cogswell on the briefs), John M. Cogswell Law
Office, Buena Vista, Colorado, for Appellants.

Marc D. Flink, Baker & Hostetler, Denver, Colorado (Todd L. Lundy and L.
Andrew Cooper, Baker & Hostetler, Denver, Colorado; W. Perry Dray and
Gregory C. Dyekman, Cheyenne, Wyoming, with him on the briefs), for
Appellees.

---

Before **PORFILIO** , **McWILLIAMS** , and **ANDERSON** , Circuit Judges.

---

**ANDERSON** , Circuit Judge.

Plaintiffs, Wyoming sugar beet farmers, appeal the dismissal of their class action against defendant, Western Sugar Company. Plaintiffs' federal cause of action, alleging a violation of the Agricultural Fair Practices Act ("AFPA"), was dismissed for failure to state a claim. Because not all members of the class satisfied the $75,000 jurisdictional amount required under 28 U.S.C. § 1332 for a diversity action, the court declined to exercise supplemental jurisdiction over plaintiffs' state law claims and dismissed them without prejudice. This appeal followed. We affirm, holding as follows on the central issues presented: 1) the district court correctly held that plaintiffs' complaint failed to state a claim under AFPA; and 2) because only one plaintiff's claim satisfied the $75,000 jurisdictional amount, and because 28 U.S.C. § 1367 has not overturned the historical rule under 28 U.S.C. § 1332 that plaintiffs in a diversity class action must each satisfy that jurisdictional amount, the district court correctly dismissed plaintiffs' state law claims without prejudice.

**BACKGROUND**

The plaintiffs are Wyoming farmers who grow sugar beets under contract for Western Sugar Company, a Colorado corporation. Each farmer had four separate contracts with Western Sugar covering crop years 1985-87, 1988-90, 1991-92, and 1993-95. In accordance with those contracts, the Wyoming farmers

delivered beets to Western Sugar's Lovell facility, where they were put in a pile and weighed. Because sugar beets can lose their sugar over time, a phenomenon referred to as "pile loss," Western Sugar took samples from and measured the sugar content of each grower's beets both at the time they were delivered and at the time they were processed. The latter samples, taken from sliced sugar beets at the beginning of the manufacturing process, are referred to as "factory cossette samples." The difference in sugar content between the samples taken at the time of delivery and the factory cossette samples is referred to as the "polarity difference," or "PD." The PD was used to calculate payments under the contracts, which were based on the market price of sugar, the weight of beets delivered, and the sugar content of each grower's beets.

Plaintiffs contend that the manufacturing process used at the Lovell facility permitted too many adulterants, such as water and soil, to adhere to the sliced beets that were used for the factory cossette samples. The presence of these adulterants lowered the sugar content measurement, thereby increasing the PD. This, in turn, lowered the payments the growers received under their contracts.

Based on this contention, the plaintiffs brought suit on behalf of themselves and all persons who grew sugar beets under contract for Western Sugar between 1985 and 1995. The complaint asserted federal claims under the Sherman Act and

AFPA, as well as five state law claims, alleging breach of contract, breach of an implied duty of good faith and fair dealing, breach of fiduciary duty, promissory estoppel, and a violation of the Wyoming Weights and Measurers Act, Wyo. Stat. Ann. §§ 40-10-117 to -136 and its predecessor, Wyo. Stat. Ann. §§ 40-10-101 to -116 (repealed 1993). At the time of the district court ruling at issue on appeal, the only claims remaining in the suit were a single federal claim under AFPA and the state law claims. [1] The plaintiffs made no allegations that their freedom to join or not join any association or cooperative was in any way hindered by Western Sugar.

The district court dismissed the AFPA claim for failure to state a claim. The court determined that no plaintiff's remaining state claims met the $75,000 amount in controversy necessary for the exercise of diversity jurisdiction under 28 U.S.C. § 1332. Before the court, however, was a pending motion to amend the complaint to add a prayer for punitive damages to one of the state claims. If granted, this amendment would increase the potential recoverable damages of plaintiff Rodriquez Farms, Inc. to $75,000 or more. The court denied the motion to amend as futile, reasoning that, even if Rodriquez Farms could meet the jurisdictional limit, the court could not exercise supplemental jurisdiction over the

---

[1]The plaintiffs agreed to the dismissal of their Sherman Act claim.

claims of the remaining plaintiffs. Therefore, the court dismissed plaintiffs' state law claims without prejudice, and this appeal followed.

**DISCUSSION**

**1. Appellate Jurisdiction Over Rodriquez Farms**

As an initial matter, we must consider whether we have jurisdiction over the claims of Rodriquez Farms, Inc. Federal Rule of Appellate Procedure 3(c) provides that "[a] notice of appeal must specify the party or parties taking the appeal by naming each appellant in either the caption or the body of the notice of appeal." The caption of the notice of appeal here contains the names of only the three individual named plaintiffs, and not the name of Rodriquez Farms, another named plaintiff below. Both the docketing statement and the caption of appellants' opening brief also omit Rodriquez Farms as a named appellant. The body of the notice of appeal, however, states that "[n]otice is hereby given that all of the plaintiffs in the above named case hereby appeal," and the notice of appeal is signed by John M. Cogswell, Esq., who represented all four plaintiffs in the district court.

Plaintiffs contend that Rodriquez Farms is properly an appellant under Rule 3(c), and they move to amend the caption to reflect the inclusion of Rodriquez Farms. Rule 3(c) provides that "[a]n attorney representing more than one party

may fulfill th[e] requirement [to specify the parties taking the appeal] by describing those parties with such terms as 'all plaintiffs.'" Such a description will be sufficient if "it is objectively clear that a party intended to appeal." Fed. R. App. P. 3(c) advisory committee's note (1993). We agree with plaintiffs that it is objectively clear that Rodriquez Farms intended to appeal the district court's order, especially in light of the fact that it is the only plaintiff capable of meeting the $75,000 amount in controversy necessary for diversity jurisdiction. We turn, then, to the merits of plaintiffs' appeal.

### 2. AFPA Claim

In 1968, Congress enacted AFPA, 7 U.S.C. §§ 2301-2306, to "protect[] the right of farmers and other producers of agricultural commodities to join cooperative associations through which to market their products." Michigan Canners & Freezers Ass'n v. Agricultural Mktg. & Bargaining Bd., 467 U.S. 461, 464 (1984) (footnote omitted).

> Although the Act's principal purpose is to protect individual producers from interference by processors when deciding whether to belong to a producers' association, the Act also protects the producer from coercion by associations of producers. The AFPA thus provides that it is unlawful for either a processor or a producers' association to engage in practices that interfere with a producer's freedom to choose whether to bring his products to market himself or to sell them through a producers' cooperative association.

Id.

-6-

Among the Act's prohibitions is the following: "It shall be unlawful for any handler knowingly to [make] or permit any employee or agent . . . [t]o make false reports about the finances, management, or activities of associations of producers or handlers." 7 U.S.C. § 2303(e). The complaint here alleged that Western Sugar violated the prohibition contained in § 2303(e) by "conduct[ing] cossette tests on the 1985-1995 crops contrary to the standards established by the U.S.D.A. and report[ing] to the growers false results and PD determinations." Appellant's App. at 48 (Complaint, ¶ 73(a)).

The district court ruled that plaintiffs' allegations failed to state a claim under AFPA on three grounds. First, the court stated that a false cossette sample report did not fall within the scope of reports about the "finances, management, or activities of associations of producers or handlers" under § 2303(e). Second, the court said that, "[a]bsent the conclusory statement under Paragraph 73(a)," the complaint did not contend that the cossette sample test results were false. Appellant's App. at 153 (Telephonic Oral Ruling Transcript). Rather, the court noted, the complaint alleged that adulterants in the cossette samples resulted in higher PDs. Finally, the court concluded that, even if Western Sugar issued false reports about its finances, management or activities, it did not do so "in an attempt to coerce or influence a producer to join or not to join an association." Id.

"We review de novo the district court's dismissal for failure to state a claim upon which relief may be granted." Dill v. City of Edmond, 155 F.3d 1193, 1201 (10th Cir. 1998). Such dismissal "is inappropriate unless [p]laintiff can prove no set of facts in support of his claims that would entitle him to relief." Id. Furthermore, we must "accept all factual allegations in the complaint as true." Id.

Plaintiffs and defendants present dueling canons of statutory construction to support their respective interpretations of AFPA. Because some of the arguments relate to § 2303(e) in context, we set out the entire section:

It shall be unlawful for any handler knowingly to engage or permit any employee or agent to engage in the following practices:

(a) To coerce any producer in the exercise of his right to join and belong to or to refrain from joining or belonging to an association of producers, or to refuse to deal with any producer because of the exercise of his right to join and belong to such an association; or

(b) To discriminate against any producer with respect to price, quantity, quality, or other terms of purchase, acquisition, or other handling of agricultural products because of his membership in or contract with an association of producers; or

(c) To coerce or intimidate any producer to enter into, maintain, breach, cancel, or terminate a membership agreement or marketing contract with an association of producers or a contract with a handler; or

(d) To pay or loan money, give any thing of value, or offer any other inducement or reward to a producer for refusing to or ceasing to belong to an association of producers; or

(e) To make false reports about the finances, management, or activities of associations of producers or handlers; or

(f) To conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by this chapter.

7 U.S.C. § 2303. Under the definitions of AFPA, plaintiffs are producers and Western Sugar is a handler. [2]

"'In interpreting statutes, we begin with the relevant language.'" Southern Ute Indian Tribe v. Amoco Prod. Co., 151 F.3d 1251, 1257 (10th Cir. 1998) (en banc) (quoting Aulston v. United States, 915 F.2d 584, 589 (10th Cir. 1990)). If congressional will "'has been expressed in reasonably plain terms, "that language must ordinarily be regarded as conclusive."'" Id. (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570 (1982) (quoting Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980))). We do not, however, read specific statutory language in isolation: we "'must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.'" Id. (quoting K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988)).

---

[2]"Handler" also includes within its definition "associations of producers." 7 U.S.C. § 2302(a); Michigan Canners, 467 U.S. at 465 n.3.

## A. False reports

We must first determine whether plaintiffs have sufficiently alleged that Western Sugar made "false reports about the finances, management, or activities of associations of producers or handlers" under § 2303(e), when they alleged that Western Sugar "conducted cossette tests on the 1985-1995 crops contrary to the standards established by the U.S.D.A. and reported to the growers false results and PD determinations." Appellant's App. at 48 (Complaint ¶ 73(a)). The complaint asserted that Western Sugar "massaged cossette records and tampered with scales," Appellant's App. at 10 (Complaint ¶ 16(c)), and that the cossette samples it used were adulterated with water and other debris. Plaintiffs then asserted that those adulterated cossette samples were used to calculate inaccurate (i.e. falsely high) PD measurements, which Western Sugar, a "handler," reported to plaintiffs.

Initially, we note that we could read § 2303(e) to prohibit only false reports about third parties, not false reports by a handler about its *own* activities. However, it is not clear that such an interpretation is the only permissible one, so we assume the statute reaches a handler's false reports about itself. We must then consider whether Western Sugar's provision of inaccurate PD measurements to plaintiffs constituted the making of "false reports" under § 2303(e). To the extent the PD measurements provided by Western Sugar were based upon faulty or

incorrect underlying data or materials (the adulterated cossette samples), we agree that, for purposes of dismissal under Rule 12(b)(6), plaintiffs have sufficiently alleged a "false report" under § 2303(e).

### B. Intent to influence association membership

More problematic is the issue of whether plaintiffs must allege that the false reports were intended to influence, or were otherwise made in connection with, the joining or refusal to join an association of producers. As both sides point out, the other subsections of § 2303 explicitly reference the "right to join" or "membership in" or "contract with" an association, and make it clear that the particular prohibited conduct must involve an attempt to influence or coerce such membership. Thus, § 2303(d) makes it unlawful for a handler "[t]o pay or loan money, give any thing of value, or offer any other inducement or reward to a producer <u>for refusing to or ceasing to belong to an association of producers</u>." 7 U.S.C. § 2303(d) (emphasis added).

Plaintiffs and defendants draw precisely the opposite conclusion from that fact. Plaintiffs argue that Congress evidently purposely left out any requirement that the false report be made in connection with membership in an association, while Western Sugar argues that subsection (e) must be read in the context of the entire Act which, read as a whole, clearly indicates that Congress intended to

-11-

prohibit only false reports which are designed to have an effect on association membership.

We agree with Western Sugar that the better view is to read AFPA as a whole. The declaration of policy for AFPA contains the following:

> Because agricultural products are produced by numerous individual farmers, the marketing and bargaining position of individual farmers will be adversely affected *unless they are free to join together voluntarily in cooperative organizations* as authorized by law. *Interference with this right is contrary to the public interest* and adversely affects the free and orderly flow of goods in interstate and foreign commerce.

7 U.S.C. § 2301 (emphasis added). As the Supreme Court has also acknowledged, AFPA's "principal purpose is to protect individual producers from interference by processors when deciding whether to belong to a producers' association." Michigan Canners, 467 U.S. at 464.

Turning to the specific language of § 2303(e), we consider whether its meaning is clear, bearing in mind that we read it in its statutory context. Under § 2303(e), handlers like Western Sugar are prohibited from making false reports about the "finances, management, or activities" of either "*associations of producers*" or "*handlers*." (Emphasis added.) Although the statute does not explicitly reference influencing decisions regarding membership in such associations, it is self-evident that creating false reports about "associations of producers" would influence decisions by producers whether to join such

-12-

associations. Thus, the language prohibiting false reports about associations of producers, in our view, unambiguously assumes such influence, and Congress evidently omitted as unnecessary any explicit reference to such influence.

We deal here, however, with alleged false reports by a handler about its *own* activities—that is, activities of "handlers" under § 2303(e). While the statute, on its face, appears to prohibit any such reports (it prohibits false reports by a handler about "handlers"), regardless of intent or effect on association membership, the question is whether we must infer in that language what is clearly inferred in the language addressing false reports about the activities of "associations of producers," and what is explicit in the remainder of § 2303—namely, that the false reports must be intended to, or have the effect of, influencing whether to join an association. We hold that we must. To hold otherwise would be to create a liability under AFPA for false reports about *handlers* which is far beyond the liabilities created by the rest of § 2303, and far beyond the scope of AFPA.

Further, the necessity to infer such intent creates an ambiguity, which permits us to examine the legislative history of AFPA. That legislative history supports our interpretation. Section 2303 is described as containing a "[p]rohibition of coercion, discrimination, intimidation, bribery,     <u>falsehood</u> , and conspiracy  <u>designed to influence a producer's election as to joining a cooperative</u>

or otherwise marketing his produce  ." S. Rep. No. 90-474, at 1 (1967),  reprinted in 1968 U.S.C.C.A.N. 1867, 1868 (emphasis added).  The Senate Report further stated that the Committee on Agriculture and Forestry "sought language that would make it completely clear that the prohibited action is  prohibited only where its motivation is interference with the producer's free choice  ."  Id. at 5,  reprinted in 1968 U.S.C.C.A.N. at 1872 (emphasis added).

In sum, while read in isolation, § 2303(e) arguably prohibits a handler from making *any* false reports about its own activities, without restriction, the section must be read in context.  What is clear from AFPA and § 2303 as a whole, and its legislative history, is that the evil Congress was attacking was influencing or pressuring, in a variety of ways, a producer's free choice whether to join an association of producers.  The prohibition on the making of "false reports" must therefore apply only to false reports about associations of producers or handlers which are intended to influence or that have the effect of influencing a producer's decision to join an association.

Since plaintiffs' complaint made no allegation concerning membership in such an association, we affirm the district court's dismissal of plaintiffs' AFPA claim for failure to state a claim.  We turn now to whether the court properly dismissed without prejudice plaintiffs' state law claims.

### 3. Supplemental Jurisdiction Over State Law Claims

Plaintiffs contend that, even if they have failed to state a federal claim under AFPA, the district court has diversity jurisdiction over their state law claims. Pursuant to 28 U.S.C. § 1332(a)(1), "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States." The Supreme Court has historically interpreted § 1332's "matter in controversy" language to require plaintiffs who have separate and distinct claims, but unite together in a single suit, to each meet the jurisdictional amount in controversy.[3] See Zahn v. International Paper Co., 414 U.S. 291, 300-01 (1973); Snyder v. Harris, 394 U.S. 332, 335-38 (1969).

> Aggregation has been permitted only (1) in cases in which a single plaintiff seeks to aggregate two or more of his own claims against a single defendant and (2) in cases in which two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest.

Snyder, 394 U.S. at 335. In Snyder, the Court refused to reconsider its longstanding construction of a "matter in controversy," noting that "Congress has

---

[3]While Zahn requires each individual plaintiff to satisfy the jurisdictional amount, the Supreme Court has historically interpreted § 1332 to require only the named class representatives in a class action to be diverse from the defendants. See Supreme Tribe of Ben Hur v. Cauble, 255 U.S. 356, 365-67 (1921). Thus, individual class members need not be diverse, although they each must meet the jurisdictional amount in controversy.

. . . consistently amended the amount-in-controversy section and re-enacted the 'matter-in-controversy' language without change of its jurisdictional effect against a background of judicial interpretation that has consistently interpreted that congressionally enacted phrase as not encompassing the aggregation of separate and distinct claims." Id. at 339.

Therefore, under the historical interpretation of § 1332, any plaintiff in a diversity class action—whether class representative or putative class member—who does not meet the jurisdictional amount in controversy must be dismissed from the action, and if no plaintiff can meet the amount in controversy, the entire class action must be dismissed. See Zahn, 414 U.S. at 300. At issue here is whether the enactment of 28 U.S.C. § 1367, concerning supplemental jurisdiction, altered the historical aggregation rules under § 1332 for class actions.

The record reflects that each of the named plaintiffs and putative class members has one or more separate and distinct claims against Western Sugar. The named plaintiffs conceded in the district court that an "aggregation theory based upon the 'common undivided interest and single title' analysis is unlikely to apply." Appellant's App. at 81. They argue, however, that so long as one class representative meets the jurisdictional amount in controversy, the plain language

of 28 U.S.C. § 1367(a) permits the district court to exercise supplemental jurisdiction over all the other plaintiffs' claims.

Section 1367, which was enacted as part of the Judicial Improvements Act of 1990, provides in pertinent part as follows:

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

> (b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

Plaintiffs argue that the enactment of § 1367 had the effect of overruling Zahn's requirement that each member of a plaintiff class meet the jurisdictional amount in controversy. Therefore, they argue, if Rodriquez Farms can meet the $75,000 jurisdictional amount in controversy, the court can exercise supplemental jurisdiction over the claims of the other class representatives and putative class

-17-

members, even though none of them can meet the jurisdictional amount in controversy.

Whether § 1367 permits such an exercise of supplemental jurisdiction in a class action is a question of first impression for this court. We first examine the statutory language and decide whether Congress has spoken "'in reasonably plain terms.'" Southern Ute, 151 F.3d at 1257 (quoting Griffin, 458 U.S. at 570). If the statutory language is clear and unambiguous, we normally find that language conclusive. Id. If the language is ambiguous, however, we may "resort to legislative history as an aid to interpretation." United States v. Simmonds, 111 F.3d 737, 742 (10th Cir. 1997). While we have noted that "there is 'no errorless test' for recognizing ambiguity," Biodiversity Legal Found. v. Babbitt, 146 F.3d 1249, 1254 (10th Cir. 1998) (quoting United States v. Turkette, 452 U.S. 576, 580 (1981)), we have observed that a "split in the circuits is, in itself, evidence of the ambiguity" of a statutory phrase. State Ins. Fund v. Southern Star Foods, Inc. (In re Southern Star Foods, Inc.), 144 F.3d 712, 715 (10th Cir. 1998), petition for cert. filed, 67 U.S.L.W. 3156 (Aug. 19, 1998) (No. 98-310).

The Fifth Circuit was the first circuit court to directly address the issue before us. That court held that § 1367 is neither unclear nor ambiguous: "The statute's first section vests federal courts with the power to hear supplemental claims generally, subject to limited exceptions set forth in the statute's second

section. Class actions are not among the enumerated exceptions." Free v. Abbott Lab. (In Re Abbott Lab. ), 51 F.3d 524, 528 (5th Cir. 1995). While acknowledging that the omission of class actions from § 1367(b)'s exceptions "may have been a clerical error," the court nonetheless held that "the statute is the sole repository of congressional intent where the statute is clear and does not demand an absurd result." Id. at 528-29. After concluding that overruling Zahn "is not an absurd result," the court held that § 1367 permitted the district court to exercise supplemental jurisdiction over class members who did not meet the amount in controversy requirement. Id. at 529. The Seventh Circuit subsequently followed Abbott, finding that its rationale had "strong support from the statutory text." Stromberg Metal Works, Inc. v. Press Mechanical, Inc. , 77 F.3d 928, 930 (7th Cir. 1996). [4] Thus, two circuits have held that § 1367 overruled Zahn. Against that, the majority of district courts addressing the issue have ruled that § 1367 did not overrule Zahn.[5] Commentators and treatises are divided. [6]

---

[4]Stromberg was not a class action; it involved two plaintiffs, only one of whom met the jurisdictional amount in controversy. The Seventh Circuit later followed Stromberg and Abbott to hold, in a class action, that "[a]t least one named plaintiff must satisfy the jurisdictional minimum. If he does, the other named plaintiffs and the unnamed class members can, by virtue of the supplemental jurisdiction conferred on the federal district courts by 28 U.S.C. § 1367, piggyback on that plaintiff's claim." In re Brand Name Prescription Drugs Antitrust Litig., 123 F.3d 599, 607 (7th Cir. 1997), cert. denied, 118 S. Ct. 1178, and cert. denied, 118 S. Ct. 1336, and cert. denied, 118 S. Ct. 1337 (1998).

[5]See, e.g. Russ v. State Farm Mut. Auto. Co. Ins., 961 F. Supp. 808 (E.D.
(continued...)

In determining that nothing in the language of § 1367 limited the broad grant of authority conferred by § 1367(a) so as to preserve the historical aggregation rules for class actions under § 1332, the Fifth and Seventh Circuits focused only on the absence of Rule 23 from the exceptions enumerated in § 1367(b).  Abbott, 51 F.3d at 527-29.  Those exceptions, however, concern only

---

<sup>5</sup>(...continued)
Pa. 1997); Ren-Dan Farms, Inc. v. Monsanto Co., 952 F. Supp. 370, 376 (W.D. La. 1997); McGowan v. Cadbury Schweppes, PLC, 941 F. Supp. 344, 347-48 (S.D.N.Y. 1996); DeCastro v. AWACS, Inc., 935 F. Supp. 541, 547 (D.N.J. 1996), appeal dismissed, 940 F. Supp. 692 (D.N.J. 1996); Blair v. Source One Mortgage Servs. Corp., 925 F. Supp. 617, 622-24 (D. Minn. 1996); Snider v. Stimson Lumber Co., 914 F. Supp. 388, 389-92 (E.D. Cal. 1996).  Included among the district courts finding Zahn not overruled are several from this circuit. See Henkel v. ITT Bowest Corp., 872 F. Supp. 872, 875-79 (D. Kan. 1994); Leroy Cattle Co. v. Fina Oil & Chem. Co., No. 93-1286-MLB,1994 WL 151105 (D. Kan. 1994); cf. Amundson & Assocs. Art Studio, Ltd. v. National Council on Compensation Ins. Inc., 977 F. Supp. 1116, 1122-23 (D. Kan. 1997) (refusing to exercise supplemental jurisdiction over claims of class representatives and other putative class members where none of class representatives met jurisdictional amount although many unnamed putative class members did).

<sup>6</sup>Compare 5 James Wm. Moore et. al., Moore's Federal Practice ¶ 23.07[3][c] at 23-47 (3d ed. 1998) ("The conclusion that Zahn remains good law is ultimately unconvincing . . . ."); and 2 Herbert B. Newberg, Newberg on Class Actions § 6.11 ("The Act's probable overruling of Zahn is fully consistent with the reasoning of the Federal Courts Study Committee on whose recommendation the Act was adopted."); with 13 Charles Alan Wright et. al., Federal Practice & Procedure § 3523.1, at 112 (1998 Supp.) ("Perhaps the most compelling evidence from the legislative history that Section 1367 was not intended to overrule Zahn is not so much what is said in the history itself , but rather what is omitted.").  See also Packard v. Provident Nat'l Bank, 994 F.2d 1039, 1045 n.9 (3d Cir. 1993) (collecting commentaries).  See generally James E. Pfander, Supplemental Jurisdiction and Section 1367:  The Case for Sympathetic Textualism (1998) (unpublished manuscript, on file with the University of Illinois Law School).

the exercise of supplemental jurisdiction over claims against defendants who are made parties to a diversity action under certain rules and claims by plaintiffs who seek to be *added* to an on-going diversity action. [7] We are concerned, however, with whether Congress intended to change the rules about when a plaintiff can bring an *initial* diversity-based class action under Rule 23, where the court's original jurisdiction is based upon § 1332. The omission of Rule 23 from § 1367(b) has no bearing on that question.

In our view, a literal and textually faithful reading of § 1367(a) leads to the opposite conclusion from that of the Fifth and Seventh Circuits. Section 1367(a) specifically addresses "any civil action of which the district courts have <u>original jurisdiction</u>." (Emphasis added.) It then provides for <u>supplemental jurisdiction</u> over transactionally related claims. Section 1332 is what confers original

---

[7]The legislative history explains the reason for the exceptions contained in § 1367(b) as follows:

> In diversity-only actions the district courts may not hear plaintiffs'
> supplemental claims when exercising supplemental jurisdiction
> would encourage plaintiffs to evade the jurisdictional requirement of
> 28 U.S.C. § 1332 by the simple expedient of naming initially only
> those defendants whose joinder satisfies section 1332's requirements
> and later adding claims not within original federal jurisdiction
> against other defendants who have intervened or been joined on a
> supplemental basis. In accord with case law, the subsection also
> prohibits the joinder or intervention of persons a[s] plaintiffs if
> adding them is inconsistent with section 1332's requirements.

H.R. Rep. No. 101-734, at 29 (1990), <u>reprinted in</u> 1990 U.S.C.C.A.N. 6860, 6875.

jurisdiction over diversity cases and it expressly requires that the "matter in controversy exceed[] the sum or value of $75,000." While § 1332 does not expressly refer to class actions, the Supreme Court has noted that periodic congressional amendment of the diversity statute to alter only the *amount* in controversy evidences congressional agreement with the Court's holding that "matter in controversy" does "not encompass[] the aggregation of separate and distinct claims." Snyder , 394 U.S. at 339. Thus, Congress in § 1367(a) expressly excepted claims brought under § 1332 and its well-understood definition of "matter in controversy." See Pfander, supra , at 20 ("Section 1367(a) appears to assume that the existing rules of original jurisdiction will continue to apply and that the grant of supplemental jurisdiction will come into play only after the plaintiff has submitted claims in a well-pleaded complaint that properly invoke such original jurisdiction.").

Furthermore, § 1367(b) itself supports this interpretation of § 1367(a). Section 1367(b) sets forth various situations in which a court, sitting in diversity, cannot exercise supplemental jurisdiction where the exercise of such jurisdiction "would be inconsistent with the jurisdictional requirements of § 1332." 28 U.S.C. § 1367(b). That very language evidences a concern for preserving the historical and well-established rules of diversity. The fact that § 1367(b) prohibits the *addition* of claims and parties which would destroy diversity supports our

interpretation of § 1367(a) as also fully respecting the rules of diversity in cases invoking the original jurisdiction of the federal courts.

Thus, in our view § 1367(a) and (b) can be read literally, and unambiguously, to require each plaintiff in a class action diversity case to satisfy the Zahn definition of "matter in controversy" and to individually meet the $75,000 requirement. However, we recognize that it is difficult to argue persuasively that the statute is truly unambiguous when two circuit courts of appeal have reached the opposite conclusion from us, when a majority of district courts are in agreement with us (although not all for the same reasons) and when commentators are divided. We therefore assume that ambiguity in the statute permits us to examine legislative history. See United States v. Simmonds, 111 F.3d 737, 742 (10th Cir. 1997).

The legislative history of § 1367 supports our interpretation of the statute.[8] The House Report that accompanied the Judicial Improvements Act, the analysis of which was adopted by the Senate Judiciary Committee, see 136 Cong. Rec. S17580-81 (daily ed. Oct. 27, 1990), expressly states that § 1367 "is not intended to affect the jurisdictional requirements of 28 U.S.C. § 1332 in diversity-only

_____

[8]Even the Fifth and Seventh Circuits acknowledge that the legislative history suggests Congress did not intend the result those courts reached. They simply refused to look at clearly contrary legislative history in the face of what they viewed as clear statutory language.

-23-

class actions, as those requirements were interpreted prior to [ Finley v. United States , 490 U.S. 545 (1989)]." H.R. Rep. No. 101-734, at 29 (1990), reprinted in 1990 U.S.C.C.A.N. 6860, 6875. The House Report then cites Zahn as an example of the pre- Finley interpretation of the jurisdictional requirements of § 1332 that is not to be disturbed. Id. & n.17. The House Report also states that the statute provides that "[i]n diversity cases, the district courts may exercise supplemental jurisdiction, except when doing so would be inconsistent with the jurisdictional requirements of the diversity statute." Id. at 28, reprinted in 1990 U.S.C.C.A.N. at 6874. Thus, the legislative history indicates that Congress did not intend to overrule the historical rules prohibiting aggregation of claims, including Zahn's prohibition of such aggregation in diversity class actions. [9]

---

[9]There are particularly persuasive reasons to rely upon the committee report involving § 1367. "Committee reports are the most frequently cited and relied-upon sources of legislative history, and in the Court's traditional view the most authoritative source." William N. Eskridge, Jr., The New Textualism, 37 U.C.L.A. L. Rev. 621, 637 (1990) (footnote omitted). Additionally, both the Senate and the House agreed on the pertinent language, and the report was explicit in its intent that § 1367 not overrule Zahn.

Moreover, this is an unusual situation, in that the legislative history so clearly refutes the textualist analysis of the Fifth and Seventh Circuits. As one district court has aptly put it:

> To retain this case in this court [finding Zahn overruled] is to say to Congress: "We know what you meant to say, but you didn't quite say it. So the message from us in the judicial branch to you in the legislative branch is 'Gotcha! And better luck next time.'" Such a

(continued...)

-24-

We therefore conclude, from both an analysis of the language of § 1367 itself and from its legislative history, that the enactment of § 1367 did not overrule Zahn's holding that each plaintiff in a diversity-based class action must meet the jurisdictional amount in controversy under § 1332.  Accordingly, the district court correctly held that it could not exercise supplemental jurisdiction over the claims of those plaintiffs whose claims did not meet the       $ 75,000 jurisdictional amount in controversy.

Plaintiffs conceded in the district court that, even if the court allowed them to amend the complaint, only the claims of Rodriquez Farms would meet the jurisdictional amount in controversy.  Reasoning that plaintiffs desired to proceed together in a single class action, rather than have Rodriquez Farms litigate its claims by itself in federal court, the district court denied the motion to amend the complaint as futile.  On appeal, plaintiffs challenge the denial of the motion to

---

[9](...continued)
message is not required by the separation of powers.  Nor is it in harmony with the fact that Congress and the courts, however different their respective roles, are parts of a single government.

Russ v. State Farm Mut. Auto. Ins. Co., 961 F. Supp. 808, 820 (E.D. Pa. 1997).

Finally, we simply note that there are a variety of pending bills before Congress, each of which explicitly states that aggregation shall be permitted in class actions to determine whether the jurisdictional amount is met.  We wonder why Congress would see the need to be so explicit, if it had already accomplished that result in § 1367.  See, e.g., S. 2083, 105th Cong. § 3; H.R. 3789, 105th Cong. § 1.

amend only to the extent that it was based upon the district court's conclusion that it could not exercise supplemental jurisdiction under § 1367 in derogation of § 1332's historical aggregation rules. Because we have determined that the district court's underlying conclusion about supplemental jurisdiction was correct, we affirm the otherwise unchallenged denial of the motion to amend.

The judgment of the district court is AFFIRMED. Plaintiffs' motion to amend the caption to include Rodriquez Farms, Inc. as an appellant is GRANTED.