*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0296P (6th Cir.)
File Name: 04a0296p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JULIE OLDEN, RICHARD
HUNTER, WILBUR BLEAU, and
all others similarly situated,
*Plaintiffs-Appellees,*

*v.*

LAFARGE CORP.,
*Defendant-Appellant.*

No. 02-1148

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 99-10176—David M. Lawson, District Judge.

Argued: March 12, 2004

Decided and Filed: September 7, 2004

Before: MARTIN, CLAY, and CUDAHY, Circuit Judges.[*]

---

[*] The Honorable Richard D. Cudahy, Senior Circuit Judge of the
United States Court of Appeals for the Seventh Circuit, sitting by
designation.

---

### COUNSEL

**ARGUED:** Lawrence T. Hoyle, Jr., HOYLE, FICKLER,
HERSCHEL & MATHES, Philadelphia, Pennsylvania, for
Appellant. Steven D. Liddle, MACUGA & LITTLE, Detroit,
Michigan, for Appellees. **ON BRIEF:** Lawrence T. Hoyle,
Jr., HOYLE, FICKLER, HERSCHEL & MATHES,
Philadelphia, Pennsylvania, Arlene Fickler, HOYLE,
MORRIS & KERR, Philadelphia, Pennsylvania, for
Appellant. David R. Dubin, MACUGA & LITTLE, Detroit,
Michigan, for Appellees.

---

### OPINION

---

CUDAHY, Circuit Judge. Julie Olden, Richard Hunter and
Wilbur Bleau represent a class of 3,600 persons who owned
single family residences in Alpena, Michigan, from April 19,
1996 to the present, and who allege personal and property
damage caused by toxic pollutants originating from a cement
manufacturing plant belonging to the defendant Lafarge
Corporation. They have brought a class action against
Lafarge for current and future personal and real property
damages, diminution in property value and various
detrimental health effects caused by the emission of toxic
pollutants. The district court granted in part and denied in
part Lafarge's motion to dismiss and granted the plaintiffs'
motion to certify the class action. In this appeal, we are
called upon to decide whether the plaintiffs' class action
against the nation's largest cement plant is solid. In
answering this weighty question, we must also decide for the
first time in this circuit whether *Zahn v. Int'l Paper Co.,* 414
U.S. 291, 301 (1973), has been overruled by 28 U.S.C.
§ 1367.

I.

In the northeast section of Alpena, Michigan, Lafarge's cement manufacturing complex, consisting of a limestone rock quarry and a cement manufacturing plant, covers a full square mile. *See* App. at 368-70, 431. It is the largest cement manufacturing plant in the nation and has been owned and operated by Lafarge since 1987. *Id.* at 787 (noting that "the Lafarge plant is the largest cement plant in North America"). The plaintiffs allege that throughout Lafarge's ownership and operation of the plant, it has continuously and systematically disregarded "proper procedure and maintenance of its equipment that would prevent the emission of air contaminants into the surrounding community." Olden Br. At 6. As a result, Alpena residents submitted numerous complaints to the Michigan Department of Environmental Quality (MDEQ). *Id.* at 6-7. In 1994, the MDEQ and Lafarge entered into a consent decree, in part, to remedy Lafarge's emission of air contaminants. App. at 301-27. However, Lafarge violated the terms of the decree resulting in the accrual of over $5.4 million in stipulated penalties as of May of 2003. *Id.* at 219-22. In 2000, the consent decree was amended, requiring Lafarge's further compliance with statutory air pollution requirements. *Id.* at 435-62.

The plaintiffs claim that in the process of making cement, the Lafarge plant produces hazardous toxic waste and creates emissions with hazardous by-products. *Id.* at 12 (Cplt. ¶¶ 17-18). The class has alleged that release of the air contaminants from the Lafarge plant interferes with the use and enjoyment of their real and personal property and has caused or will cause diminution in the market value of this property. *Id.* at 13 (Cplt. ¶¶ 20A, 21). For example, the cement dust emitted by the plant has penetrated into the siding on houses, killed rose bushes and left a white film over houses and vehicles in Alpena. *Id.* at 280, 282-83. Additionally, hydrochloric acid, a byproduct of the cement manufacturing process, has degraded roofs, piping, concrete and the aluminum windows and doors of some homes. *Id.* at 289.

In addition to property damage caused by emissions, the plaintiffs claim to have been exposed to numerous carcinogenic, mutagenic, and teratogenic toxic substances. *Id.* at 6 (Cplt. ¶¶ 24-25). Such toxins allegedly cause the plaintiffs and their unborn children an increased risk of cancer, impaired immunological function, birth defects and developmental abnormalities, all of which are potentially life threatening and warrant continued medical monitoring. *Id.* at 6-7 (Cplt. ¶¶ 26-27). Additionally, the plaintiffs claim agony, anxiety, distress, embarrassment, humiliation, mental anguish, suffering and other related nervous conditions, psychological disorders and emotional consequences. *Id.* at 18 (Cplt. ¶ 47).

On April 19, 1999, the plaintiffs filed suit against Lafarge, alleging that the emissions trespassed on their property (Count II), created a nuisance (Count III) and arose from Lafarge's negligence or gross negligence (Count IV). *Id.* at 15-21 (Cplt. ¶¶ 29-51). The plaintiffs seek compensatory damages for physical and mental illnesses caused by the pollution and for the purchase of equipment to clean and remove emitted substances from their property. The plaintiffs also seek exemplary and punitive damages, as well as an injunction requiring Lafarge to: (a) fund a medical monitoring program (Count I); (b) repair any damage to the plaintiffs' property; (c) improve the operation of the plant to eliminate emissions; and (d) refrain from allowing emitted substances to be deposited on the plaintiffs' property. *Id.* at 14, 19-21.

On September 25, 2000, the plaintiffs moved to certify their class action. Appx. at 39. On October 26, 2000, Lafarge filed a combined motion to dismiss under Fed. R. Civ. P 12(b)(1) (lack of subject matter jurisdiction); 12(b)(6) (failure to state a claim), and to deny class certification, arguing that the plaintiffs did not meet the requirements of Fed. R. Civ. P. 23(a) (numerosity, typicality and adequacy of class representation); 23(b)(2) (individualized money damages overwhelm the requested injunctive relief); and 23(b)(3) (individuality of interests, manageability of the action, etc.). Appx. 328-29. In an order dated October 24, 2001, the

district court granted in part and denied in part Lafarge's motion to dismiss and granted the plaintiffs' motion to certify the class action. *See Olden v. Lafarge*, 203 F.R.D. 254, 258 (E.D. Mich. 2001). With regard to subject matter jurisdiction, the district court held that the supplemental jurisdiction statute confers subject matter jurisdiction over claims by putative class members that do not entail $75,000 in controversy, but that form part of the same case or controversy as the claims by other class members which exceed the jurisdictional amount. With respect to Lafarge's 12(b)(6) motion, the court held that the plaintiffs failed to state a claim for trespass under Michigan law but that the plaintiffs stated valid state law claims for nuisance and negligence. *Id.* at 264-67, 271. Finally, the district court also held that class certification was appropriate under Fed. R. Civ. P. 23(b)(2) and (3). *Id.* at 271. On appeal, Lafarge challenges only the district court's decision with respect to subject matter jurisdiction and class certification.

## II.

## DISCUSSION

We have jurisdiction over this interlocutory appeal pursuant to Federal Rule of Civil Procedure 23(f). According to Rule 23(f), "[a] Court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification . . . ." Fed. R. Civ. P. 23(f). The question of subject matter jurisdiction is a prerequisite to class certification and is therefore properly raised in this Rule 23(f) appeal. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 108 (D.C. Cir. 2002) (noting that, unlike the question of antitrust standing, the question of constitutional standing would be properly raised in a Rule 23(f) appeal). Moreover, we have an independent obligation to ensure that subject matter jurisdiction exists. *See United States v. Hays*, 515 U.S. 737, 742 (1995); *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 230-31 (1990). Therefore, we

begin by addressing the issue of subject matter jurisdiction and will then address class certification.

### 1.   *Subject Matter Jurisdiction*

The plaintiffs argue that the court's jurisdiction is proper under the diversity statute, which grants district courts "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs" and is between diverse parties. 28 U.S.C. § 1332(a). The issue raised in this case is whether each individual class member in a diversity class action must meet the $75,000 amount in controversy requirement, or whether the plaintiffs may aggregate their damages. To say that this question has been thoroughly examined is an understatement. *See Allapattah Servs., Inc. v. Exxon Corp.*, 362 F.3d 739 (11th Cir. 2004) (Tjoflat, J., dissenting) (compiling cases and articles). In fact, one of my law clerks was asked to answer this very question on a civil procedure exam in 1999. Unfortunately, however, he does not recall the answer, so we must review the issue *de novo*. *See COB Clearinghouse Corp. v. Aetna U.S. Healthcare, Inc.*, 362 F.3d 877, 880 (6th Cir. 2004) (quoting *Joelson v. United States*, 86 F.3d 1413, 1416 (6th Cir. 1996) ("We review a district court's decision to grant a motion to dismiss for lack of subject matter jurisdiction *de novo*.")).

If only the parties had asked us this question twenty years ago (or any time between 1973-1990), our discussion would be brief because the Supreme Court had made the answer plain. *See Zahn v. Int'l Paper Co.,* 414 U.S. 291, 301 (1973). In *Zahn*, four named plaintiffs brought a class action on behalf of approximately 200 lakefront property owners and lessees, seeking compensation for damages to their property rights, allegedly caused by the defendant's pollution of the lake. *Id.* at 291-92. Subject matter jurisdiction was asserted based on diversity under 28 U.S.C. § 1332. *Id.* at 292. Although the named plaintiffs had claims exceeding the then applicable amount in controversy requirement, the district

court had found that not every absent member of the plaintiff class had a claim that satisfied the requisite amount. *Id.* The Supreme Court, consistent with earlier decisions, including *Snyder v. Harris,* 394 U.S. 332 (1969), held that the claims of multiple parties, when separate and distinct, cannot be aggregated for purposes of meeting the jurisdictional amount.

The decision in *Zahn* was reaffirmed by the Supreme Court in *Finley v. United States*, 490 U.S. 545, 556 (1989). In *Finley*, the petitioner brought suit in federal court after her husband was killed when his plane struck electric transmission lines. *Id.* at 546. She asserted a claim under the Federal Tort Claim Act (FTCA) against the Federal Aviation Administration (FAA) and state law claims against San Diego Gas and Electric Power Company arguing that it had negligently placed and inadequately illuminated its power lines. *Id.* The Supreme Court found no "pendent party" jurisdiction over San Diego Gas. *Id.* at 556. It held that a grant of jurisdiction over claims involving particular parties does not confer jurisdiction over additional claims by or against different parties, even if all of the claims derive from a common nucleus of operative facts and consideration of the additional claims might promote judicial economy and efficiency. *Id.*

In 1990, Congress enacted the Judicial Improvements Act (the Act), a statute clarifying the supplemental jurisdiction of federal courts. *See* 28 U.S.C. § 1367. The statute provides, in relevant part, that:

**(a)** Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such

supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

**(b)** In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

**(c)** The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--

**(1)** the claim raises a novel or complex issue of State law,

**(2)** the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

**(3)** the district court has dismissed all claims over which it has original jurisdiction, or

**(4)** in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367. Shortly after the passage of the Act, a question arose as to whether Congress had overruled *Zahn*. The Fifth Circuit was the first to answer this question. *See In re Abbott Labs.*, 51 F.3d 524 (5th Cir. 1995). In short, the Fifth Circuit held that Congress had overruled *Zahn*, noting that "Section 1367(a) grants district courts supplemental

jurisdiction over related claims generally, and § 1367(b) carves exceptions. Significantly, class actions [which are governed by Rule 23] are not among the exceptions." *Id.* at 527. Because Rule 23 was not included in the list of exceptions, Congress had seemingly granted supplemental jurisdiction over the claims of absent class members who independently could not meet the required amount in controversy.

In so holding, the Fifth Circuit believed that Congress had not subjectively intended to overrule *Zahn*. *Id.* at 528. In fact, courts have almost universally noted that the legislative history of § 1367 reveals that Congress did not intend to overrule *Zahn*. *See, e.g., Gibson v. Chrysler Corp.*, 261 F.3d 927, 939 (9th Cir. 2001) ("We agree with the Third, Eighth and Tenth Circuits to this degree: the legislative history provides a substantial basis to believe that the omission of claims by Rule 23 plaintiffs from subsection (b) of § 1367, and the resulting overruling of *Zahn*, was an oversight."). The House Committee on the Judiciary, for instance, considered the bill as "noncontroversial" and "relatively modest," which would seem inconsistent with a statute intended to overrule a long-established precedent like *Zahn*. H. Rep. 101-734 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6860, 6861. The legislative history suggests that Congress only intended the statute to overrule *Finley* and thus "essentially restore the pre-*Finley* understandings of the authorization for and limits on other forms of supplemental jurisdiction." *Id.* at 6874. Perhaps most convincing is the fact that the legislative history specifically states that this "section is not intended to affect the jurisdictional requirements of 28 U.S.C. § 1332 in diversity-only class actions, as those requirements were interpreted prior to *Finley*." *Id.* at 6875. A footnote to this passage cites *Zahn* as a pre-*Finley* case unaffected by the Act. *Id.* at n.17.

Nonetheless, because it found that the plain language of the statue was unambiguous and because no absurd result would follow from such an interpretation, the Fifth Circuit was

unmoved by the legislative history. *See In re Abbott Labs*, 51 F.3d at 529. It concluded that "[o]mitting the class action from the exception may have been a clerical error . . . [b]ut the statute is the sole repository of congressional intent where the statute is clear and does not demand an absurd result." *Id.* at 528-29.

The Seventh Circuit agreed with the Fifth, stating that "although, as *Abbott Laboratories* discussed, some legislative history suggests that the responsible committees did not expect § 1367 to upset *Zahn,* the text is not limited in this way. When text and legislative history disagree, the text controls." *Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928, 931 (7th Cir. 1996) (citation omitted). Eventually, the Ninth, Fourth and most recently, the Eleventh Circuit also concluded that *Zahn* had been overruled. *See Allapattah*, 333 F.3d at 1248; *Gibson*, 261 F.3d at 927; *Rosmer v. Pfizer, Inc.*, 263 F.3d 110, 114 (4th Cir. 2001).

There has been anything but unanimity, however. The Tenth Circuit, in *Leonhardt v. Western Sugar Co.*, 160 F.3d 631, 641 (10th Cir. 1998), found the Act to be ambiguous and thus consulted the legislative history, ultimately holding that *Zahn* was still good law. The Court in *Leonhardt* observed that:

Section 1367(a) specifically addresses "any civil action of which the district courts have *original jurisdiction.*" (Emphasis added.) It then provides for *supplemental jurisdiction* over transactionally related claims. Section 1332 is what confers original jurisdiction over diversity cases and it expressly requires that the "matter in controversy exceed[ ] the sum or value of $75,000." While § 1332 does not expressly refer to class actions, the Supreme Court has noted that periodic congressional amendment of the diversity statute to alter only the *amount* in controversy evidences congressional agreement with the Court's holding that "matter in controversy" does "not encompass[ ] the aggregation of

separate and distinct claims." *Snyder,* 394 U.S. at 339. Thus, Congress in § 1367(a) expressly excepted claims brought under § 1332 and its well-understood definition of "matter in controversy."

*Leonhardt*, 160 F.3d at 640. The Eighth Circuit and the Third Circuit adopted the reasoning of *Leonhardt*, finding that *Zahn* had not been overruled. *See Trimble v. Asarco, Inc.*, 232 F.3d 946, 962 (8th Cir. 2000); *Meritcare Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214, 222 (3d Cir. 1999); *see also Ortega v. Star Kist Foods, Inc.*, No. 02-2530, 2004 WL 1205720 at *9 (1st Cir. June 2, 2004) (applying the reasoning of *Leonhardt* in the context of Rule 20 joinder). The Third Circuit went a step further. It found that it could consult the legislative history, even if the statute was not ambiguous, arguing that departure from the usual rule is appropriate in rare cases where the literal application of the statute would produce results "demonstrably at odds with the intentions of its drafters." *Meritcare Inc.*, 166 F.3d at 222 (citation omitted). The Fourth and Ninth Circuits responded critically to the argument of *Leonhardt* and provided an explanation why *Leonhardt*'s alternative interpretation could not stand. *See Rosmer*, 263 F.3d at 115-17; *Gibson*, 261 F.3d at 934-40; *see also Ortega*, 2004 WL 1205720 at *19 (Torruella, J., dissenting). The Seventh Circuit also dismissed such alternative interpretations as "inventive." *Stromberg Metal Works, Inc.*, 77 F.3d at 932 (citations omitted). The Supreme Court attempted to resolve the issue; however, it split 4-4, and its summary affirmance provided no insight. *See Free v. Abbott Labs*, 529 U.S. 333 (2000) (per curiam).

Until now, this court has yet to speak on the question. Today, we join with the majority of circuits which have considered the question and hold that *Zahn* has been

overruled.[1] We note that the majority of courts have been reaching this same conclusion for almost ten years now and Congress has yet to alter or amend § 1367 to correct them. For almost ten years, courts have acknowledged that the text of § 1367 unambiguously overrules *Zahn*, while its legislative history shows a clear intent to preserve *Zahn*. Rules of statutory construction teach that generally a court cannot consider the legislative history of a statute in interpreting its meaning unless the statute is ambiguous. *See In re Comshare*

---

[1] We acknowledge that there might be a way to decide this case without stepping into the *Zahn* morass. However, we can do so only by way of a different jurisdictional morass. The plaintiffs argue that jurisdiction is proper because we can determine the amount in controversy by examining the expected cost to the defendant of complying with the injunction which the plaintiffs seek. Unfortunately, there is a circuit split as to whether a court may determine the amount in controversy from the perspective of either party (the "either viewpoint rule") or whether a court may only consider the plaintiff's viewpoint. *See, e.g., In re: Ford Motor Co./Citibank*, 264 F.3d 952, 958 (9th Cir. 2001) (applying the "either viewpoint rule"); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 609 (7th Cir. 1997) (same); *Oklahoma Retail Grocers Ass'n v. Wal-Mart Stores, Inc.*, 605 F.2d 1155, 1159 (10th Cir. 1979) (same); *Williams v. Kleppe*, 539 F.2d 803, 804 n.1 (1st Cir. 1976) (same); *Tatum v. Laird*, 444 F.2d 947, 951 (D.C. Cir. 1971) (same), *rev'd on other grounds*, 408 U.S. 1 (1972); *but see Garcia v. Koch Oil Co. of Tex., Inc.*, 351 F.3d 636, 640 n.4 (5th Cir. 2003) (applying the "plaintiff's viewpoint" rule); *Ericsson GE Mobile Communications, Inc. v. Motorola Communications & Elecs., Inc.*, 120 F.3d 216, 219-220 (11th Cir. 1997) (same); *Massachusetts State Pharm. Ass'n v. Fed. Prescription Serv., Inc.*, 431 F.2d 130, 132 n.1 (8th Cir. 1970) (same). This circuit has not yet chosen an approach and we decline to weigh in on two major circuit splits in the same day. Nonetheless, we do note that many cases have been suggested to indicate our adoption of, or preference for, one rule over the other. *See, e.g., Glenwood Light & Water Co. v. Mutual Light, Heat & Power Co.*, 239 U.S. 121 (1915); *Sherwood v. Microsoft Corp.*, 91 F. Supp. 2d 1196 (2000); *Lodal, Inc. v. Home Ins. Co. of Ill.*, 156 F.3d 1230 (6th Cir. 1998); *Sellers v. O'Connell*, 701 F.2d 575 (6th Cir. 1983); *Goldsmith v. Sutherland*, 426 F.2d 1395 (6th Cir. 1970); *Pa. R. Co. v. City of Girard*, 210 F.2d 437 (6th Cir. 1954). In none of these cases, however, did the court either consider this issue or express a subtle preference one way or the other. Therefore, we leave this interesting question for another day.

*Inc. Sec. Litig.*, 183 F.3d 542, 549 (6th Cir. 1999) ("When interpreting a statute, we must begin with its plain language, and may resort to a review of congressional intent or legislative history only when the language of the statute is not clear.") (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980)); *Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1014 n.10 (6th Cir. 1997) ("We have not referred to legislative history in our discussion of this issue because, where the statutory meaning is clear, we do not resort to legislative history."). This tension has created a strong incentive to interpret what we believe to be unambiguous as ambiguous, in order to open the door to the legislative history. *See, e.g., Crooks v. Harrelson*, 282 U.S. 55, 60 (1930) ("Courts have sometimes exercised a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which literally they did not bear in order to escape consequences thought to be absurd or to entail great hardship.").

For instance, Judge Tjoflat, in his recent dissent from the denial of rehearing *en banc* in *Allapattah*, considered *Leonhardt*'s alternative interpretation of § 1367 and noted that it is "arguably an absurd interpretation of the statute because it would permit courts to exercise supplemental jurisdiction only in cases where it didn't need to . . .". *Allapattah*, 362 F.3d at 770 n.28 (Tjoflat, J., dissenting). He also considered another alternative interpretation of § 1367 proposed in *Snider v. Stimson Lumber Co.*, 914 F. Supp. 388, 391 (E.D. Cal. 1996). Of the *Snider* interpretation, Judge Tjoflat noted that he "[does] not agree entirely with [its] reasoning." *Allapattah*, 362 F.3d at 771. Nonetheless, based on *Leonhardt's* "arguably . . . absurd interpretation" and *Snider's* interpretation with which Judge Tjoflat admits disagreeing, he found § 1367 "sufficiently ambiguous as to warrant resort to the legislative history." *Id.*

Courts such as the Tenth Circuit in *Leonhardt* have strained to develop an alternative interpretation which they argue proves that the statute is at least ambiguous. *See, e.g.,*

*Ortega*, 2004 WL 1205720 at *16 (Torruella, J., dissenting) (noting that the *Leonhardt* interpretation "was never articulated by any Congressperson or their staff, by any judge or jurist, nor by any academics, or, most importantly by any of the very drafters of the statute from the time the statute was adopted in 1990, until such 'intent' was just espoused in 1998"). Interestingly, this alternative interpretation is not consistent with the understanding of the drafters of § 1367, who acknowledge that the failure to include Rule 23 was an oversight. *See* James E. Pfander*, Supplemental Jurisdiction and Section 1367: The Case for a Sympathetic Textualism*, 148 U. Pa. L. Rev. 109, 144 n.132 (1999) ("[L]ast-second concerns prompted the drafters to worry about their failure to include a restriction for claims joined under Rule 23. They caught the Rule 23 implications too late, however, to address [them] with a change to the statutory language and so relied upon a curative reference in the legislative history instead."); Thomas D. Rowe, Jr., et al., *Compounding Confusion or Creating Confusion About Supplemental Jurisdiction? A Reply to Professor Freer*, 40 Emory L.J. 943, 960 n.90 (1991) (one of the drafters of § 1367 notes that "[i]t would have been better had the statute dealt explicitly with this [*Zahn*] problem, and the legislative history was an attempt to correct the oversight"). Thus, it seems at least ironic that these courts rely on an alternative interpretation of § 1367 which is contradicted by its "legislative history," in order to ultimately justify treating the legislative history as dispositive. While, technically, this may be a proper application of the rules of statutory interpretation, one has to question its internal logic and whether there is ultimately any benefit from following such an approach.

We believe that the *Leonhardt* interpretation fails, in part, for the reasons enunciated in *Gibson* and *Rosmer*. *See Rosmer*, 263 F.3d at 115-17; *Gibson*, 261 F.3d at 934-40; *see also Ortega*, 2004 WL 1205720 at *19 (Torruella, J., dissenting). These authorities go through a detailed account and rebuttal of the *Leonhardt* interpretation and it is unnecessary to repeat that discussion here. Moreover,

although it is no doubt clever, we simply do not believe the *Leonhardt* interpretation to be a natural reading of this statute. *See United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 550 (1996) ("[T]he more natural reading of the statute's text, which would give effect to all of its provisions, always prevails over a mere suggestion to disregard or ignore duly enacted law as legislative oversight."); *Business Guides, Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 547 (1991) ("[T]his Court will not reject the natural reading of a rule or statute in favor of a less plausible reading, even one that seems to us to achieve a better result."). Were there no relevant legislative history in this case, we do not believe that any court would have given serious consideration to the *Leonhardt* interpretation, because no one would doubt that the statute means what it says.

It is the structure of this statute which makes its meaning unambiguous. The first part of the statute (§ 1367(a)) contains a sweeping grant of supplemental jurisdiction giving the courts supplemental jurisdiction over all claims not excluded by the second part (§ 1367(b)). The second part of the statute contains all of the exclusions.[2]     Given this

---

[2] Judge Tjoflat argues that "[t]here is nothing in the text of the statute, however, which indicates that the [exclusions] mentioned in § 1367(b) were meant to be an exclusive list." *Allapattah*, 362 F.3d at 772. He argues that to reach such a conclusion, one must implicitly apply the cannon of statutory construction known as *expressio unius est exclusio alterius* and that such application is inappropriate here, because it would override clear Congressional intent. *Id.* (citation omitted). We disagree, however, with Judge Tjoflat's first premise. We believe that the language which begins § 1367(a): "*Except as provided* in subsections (b) and (c) . . . the district courts shall have supplemental jurisdiction . . ." demonstrates that Congress intended the exclusions mentioned in those subsections to be exclusive. Therefore, we do not believe that we are applying *expressio unius* in this case so much as reading the plain language of the statute.

Even if we were required to rely on *expressio unius*, we do not read

---

structure, it defies logic to suggest that the inclusive section of the statute, containing the sweeping grant of supplemental jurisdiction, also contains a completely unspoken, yet critically important, exclusion. This is particularly true where there is no doubt that the unspoken exclusion would fit naturally into the express list of exclusions in the second part. Congress was not using 28 U.S.C. § 1367 as an opportunity to play "Hide The Ball," "Where's Waldo?" or "Find The Hidden Exclusion." To argue that the alternative interpretation is viable enough to make this statute ambiguous only begs the question of the meaning of the word "ambiguity." *Moskal v. United States*, 498 U.S. 103, 108 (1990) (discussing "the crucial question—almost invariably present—of *how much* ambiguousness constitutes . . . ambiguity") (citations omitted). If we really wanted, it is likely that we could find just about any statute to be ambiguous. Language, as compared to mathematics, is inherently imprecise. *See Northeast Women's Ctr., Inc. v. McMonagle*, 939 F.2d 57, 64 (3d Cir. 1991); *Vitello v. United States*, 425 F.2d 416, 425 (9th Cir. 1970) (Ely J., dissenting). This does not mean that we should abandon our traditional role of interpreting statutes based on the language which Congress chose to include in the text itself.

---

the cases cited by Judge Tjoflat as suggesting that *expressio unius* should not be applied to contradict legislative history, but instead that it should only be applied where its application is natural and the inference drawn, a fair one. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("As we have held repeatedly, the canon *expressio unius est exclusio alterius* does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an 'associated group or series,' . . . ."); *Neuberger v. Comm'r of I.R.S.*, 311 U.S. 83, 88 (1940), citing *United States v. Barnes*, 222 U.S. 513 (1912). We have no doubt that Rule 23 fits in naturally with the other rules listed in § 1367(b). All the rules listed in § 1367(b), like Rule 23, involve different ways of getting additional claims before the court, such as joinder, impleader and intervention. We believe that Rule 23 is similar enough to 14, 19, 20 and 24 for purposes of this statute that, if Congress did not want us to read it as excluding Rule 23, it needed to make that intent more explicit in the statute.

Nor are we persuaded by the now fashionable argument that because a number of brilliant minds have found this statute to be ambiguous, it is by definition so. *See, e.g., Leonhardt*, 160 F.3d at 640 ("[I]t is difficult to argue persuasively that the statute is truly unambiguous when two circuit courts of appeal have reached the opposite conclusion from us, when a majority of district courts are in agreement with us (although not all for the same reasons) and when commentators are divided."). The Supreme Court has regularly found statutes to be unambiguous over the dissenting views of Justices who found the contrary. *See, e.g., United States v. Labonte*, 520 U.S. 751, 763 (1997) (Breyer, J. dissenting, joined by Justices Stevens and Ginsburg) ("The majority finds . . . that the three statutory words are unambiguous; that they are not susceptible to the Commission's interpretation; and that the only possible interpretation is one that does not except recidivist enhancement provisions. In my view, however, the words 'maximum term authorized' are ambiguous."); *Dole v. United Steelworkers of Am.*, 494 U.S. 26 (1990) (White, J., dissenting, joined by Chief Justice Rehnquist) (finding the statute under consideration to be ambiguous); *United States v. Yermian*, 468 U.S. 63 (1984) (Rehnquist, J., dissenting, joined by Brennan, Stevens and O'Connor) (same); *Hoffman v. Blaski*, 363 U.S. 335 (1960) (Frankfurter, J., dissenting, joined by Harlan and Brennan) (noting that there have been "severe differences" with respect to how twenty-seven district courts have interpreted the supposedly unambiguous statute). "[W]e cannot allow the fact that other circuits have called a statute ambiguous to negate this circuit's duty to interpret the text of the enactment." *Rosmer*, 263 F.3d at 118; *see also Moskal*, 498 U.S. at 108 (noting that under the alternative rule, "one court's unduly narrow reading of a . . . statute would become binding on all other courts, including [the Supreme Court]"); *Allapattah Servs., Inc.*, 333 F.3d at 1254 ("The mere existence of a split among the circuits as to the proper interpretation of § 1367 does not relieve us of our obligation to interpret the statute independently.").

As noted *supra*, some courts have found a basis to consider and ultimately adopt the legislative history of § 1367, without the need of finding the statute ambiguous. *See, e.g., Meritcare Inc.*, 166 F.3d at 222. The Third Circuit, for instance, has found that resorting to the legislative history was appropriate in answering the § 1367 question because this is one of those "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Id.* (quoting *United States v. Sherman,* 150 F.3d 306, 313 (3d Cir. 1998) (internal quotation marks removed, alterations in original); *accord United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242 (1989).[3] Perhaps the primary rule of statutory interpretation, however, is that a court will not look beyond the statutory text if the text is unambiguous. *See BedRoc Ltd., LLC v. United States*, 124 S.Ct. 1587, 1593 (2004). Of course, if the statutory text and legislative history are consistent, this primary rule is unnecessary because the result will be the same regardless of whether a court follows the rule or not. Therefore, the primary rule only matters where there is a contradiction between the statutory text and the legislative history. The "exception" discussed in *Meritcare* has the potential to turn the primary rule on its head because every time there is an actual conflict between the statutory language and the legislative history, the legislative history may prevail over the text of the statute.

---

[3]Of course it is somewhat paradoxical that a court could find that the literal application of an *unambiguous* statute would produce a result demonstrably at odds with the intent of its drafters given that the best evidence of the intent of the drafters is supposed to be the statute itself. *See West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98-99 (1991) ("The best evidence of [Congress'] purpose is the statutory text adopted by both Houses of Congress and submitted to the President. Where that contains a phrase that is unambiguous . . . we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process.") (citation omitted).

For this reason, we believe that this exception must be construed narrowly and only applied where a literal application of unambiguous statutory language would have absurd results or "would thwart the obvious purpose of the statute." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) (citations omitted); *Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983) ("It is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute . . . ."). This is not such a case. Here, the statute was intended to overrule *Finley*, not to codify *Zahn*. No court disputes the fact that the statute fulfills its purpose. This is merely a case in which Congress may have painted with too broad a brush. We will not ignore the plain, unambiguous language of a statute where it achieves its intended purpose without any absurd result but simply has additional unintended consequences. *See Brogan v. United States*, 522 U.S. 398, 403 (1998) ("[I]t is not, and cannot be, our practice to restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy—even assuming that it is possible to identify that evil from something other than the text of the statute itself."); *accord United States v. Wade*, 266 F.3d 574, 581 (6th Cir. 2001); *see also Thompson v. Goetzmann*, 337 F.3d 489, 493 (5th Cir. 2003) ("[W]e reiterate that the courts are not in the business of amending legislation. If the plain language of the MSP statute produces the legislatively unintended result claimed by the government, the government's complaint should be addressed to Congress, not to the courts, for such revision as Congress may deem warranted, if any."); *United States v. Arnold*, 126 F.3d 82, 86 (2d Cir. 1997) ("Notwithstanding that such a result was unintended, the Court declines any invitation to redraft the statute—that is a task better left to the legislature."); *Leila G. Newhall Unitrust v. Comm'r of I.R.S.*, 105 F.3d 482, 487 (9th Cir. 1997) ("In any event, if the statute has unintended consequences, it is for Congress, not the courts, to take appropriate measures to avert them."); *In re: Appletree Mkts., Inc.,* 19 F.3d 969, 974-75 (5th Cir. 1994).

Because we find that 18 U.S.C. § 1367 achieves its intended purpose without any absurd result and because we find that its statutory language is unambiguous, we hold today that *Zahn* has been overruled. Therefore, the class may aggregate damages and subject matter jurisdiction is proper. Although we are confident about our conclusion on this matter, we are comforted by the knowledge that if it turns out we are wrong, we will be in good company. We turn now to the other issues surrounding class certification.

### 2.   *Class certification*

As discussed *supra*, the district court conditionally certified a class action under Federal Rules of Civil Procedure 23(b)(2) and (3) of "all owners of single family residences in the City of Alpena whose persons or property was damaged by toxic pollutants and contaminants which originated from the LaFarge cement manufacturing facility located in Alpena, Michigan." *Lafarge*, 203 F.R.D. at 271. The defendant appeals this conditional grant of class certification.

A class certification order is reviewed for an abuse of discretion. *See Stout v. J.D. Byrider*, 228 F.3d 709, 716 (6th Cir. 2000). "The district court's decision *certifying* the class is subject to a 'very limited' review and will be reversed 'only upon a strong showing that the district court's decision was a clear abuse of discretion.'" *Armstrong v. Davis*, 275 F.3d 849, 867 (9th Cir. 2001) (citations omitted) (emphasis added). "Abuse of discretion is defined as 'a definite and firm conviction that the trial court committed a clear error of judgment.'" *Coleman v. Gen. Motors Acceptance Corp.,* 296 F.3d 443, 446 (6th Cir. 2002) (quoting *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996)).

In order to certify any Rule 23 class action: (1) the class must be so numerous that joinder of all members is impracticable, (2) there must be questions of law or fact common to the class, (3) the claims or defenses of the representative parties must be typical of the claims or

defenses of the class, and (4) the representative parties must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). The defendant seemingly does not dispute on appeal that these prerequisites have adequately been established.

In this case, the district court certified a class under both Rule 23(b)(2) and Rule 23(b)(3). Each of these classes carries its own prerequisites as well. A Rule 23(b)(2) class action is only appropriate where

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed. R. Civ. P. 23(b)(2). A Rule 23(b)(3) class action is appropriate where:

> [T]he court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3). The defendant argues that the certification of a Rule 23(b)(3) class was an abuse of discretion because common questions do not predominate and other methods for adjudication would be superior, and similarly, that certification of a rule 23(b)(2) class action was

an abuse of discretion because individualized money damages overwhelm the plaintiffs' request for injunctive relief.

### A. Rule 23(b)(3) certification

The thrust of the defendant's argument seems to be that common questions do not predominate. According to the defendant, individual issues related to establishing causation will overwhelm the case because toxins: (a) "originated from disparate sources *within* the one-square mile Lafarge facility *and perhaps* other industrial sources;" (b) were disbursed to properties in varying concentrations; (c) allegedly caused a variety of personal injuries; and (d) allegedly caused widely varying property damages. Lafarge Br. at 32-33 (emphasis added).

With regard to the first issue, the fact that toxins may have originated from disparate sources *within* Lafarge's facility is of little relevance since Lafarge's liability presumably would not vary depending upon where within its facility toxins originated. With regard to these "other industrial sources" (presumably the Abiti Price Plant and Fletcher Paper Co.), the defendant does not allege that the toxins from these sources are indistinguishable from the toxins from Lafarge's plant.[4] Further, the defendant does not allege that these other sources produce significant amount of toxins relative to Lafarge, which admittedly is the nation's largest cement plant. Appx. at 787. Of course, if it is determined that the defendant does not, on its own, emit enough pollutants to establish liability (either because the plaintiffs cannot establish negligence, causation or "significant harm" in the case of the plaintiffs' nuisance claim), the defendant will prevail. Moreover, damages can be reduced to reflect the proportion of the class' injury not caused by the defendant.

---

[4] It appears that these "other sources" are defendants in another class action in front of the same district court judge. Therefore, if issues of potential confusion do arise, they should be immediately apparent to the district court, mitigating any concern the defendant might have.

With regard to the remaining issues, they may suggest that individual *damage* determinations might be necessary, but the plaintiffs have raised common allegations which would likely allow the court to determine liability (including causation) for the class as a whole. For instance, although some named plaintiffs admittedly describe a variety of minor personal medical issues (wheezing, "very bad breathing things," nausea, headaches, etc.) which might require individualized damage determinations, the thrust of the plaintiffs' personal injury complaint appears to be related to the general increased risk of the class suffering medical problems in the future. *See* Appx. 13-15, 18 (Cplt. at ¶¶ 22-28, 48). Whether the defendant's negligence caused *some* increased health risk and even whether it tended to cause the class minor medical issues can likely be determined for the entire class. Similarly, although some named plaintiffs present a number of minor examples of specific property damage (roof damage, dead rose bushes, damaged window pane, peeling stain on deck, rusting of automobile), these examples seem to be no more than illustrative of the common argument that the class's properties are regularly covered in cement dust, causing minor property damage and a predictable reduction of property value and enjoyment of the property. Whether the defendant's negligence generally caused minor property damage and cement dust can likely be determined for the entire class as well.[5]

---

[5]The Defendant argues that the plaintiffs' nuisance cause of action requires individualized proof because one must show "significant harm" resulting in an interference with the use of and enjoyment of property. However, if the class can show that their properties were frequently covered by cement dust, this would likely be enough to establish "significant harm." *See, e.g., Adams v. Cleveland-Cliffs Iron Co.,* 237 Mich. Appx. 51, 70, 602 N.W.2d 215, 223 (Mich. Ct. App. 1999) ("If the quantity and character of the dust are such as to disturb the ambiance in ways that interfere substantially with the plaintiff's use and enjoyment of the land, then recovery in nuisance is possible."). Further, if the class can show that they are at an increased risk of significant future medical problems, this too would likely constitute "significant harm." *See, e.g., Adkins v. Thomas Solvent Co.,* 440 Mich. 293, 303-304, 487 N.W.2d

As the district court properly noted, it can bifurcate the issue of liability from the issue of damages, and if liability is found, the issue of damages can be decided by a special master or by another method.[6] Fed. R. Civ. P. 23(c)(4)(A); *see also Simon v. Philip Morris Inc.*, 200 F.R.D. 21, 30 (E.D.N.Y. 2001) ("By bifurcating issues like general liability or general causation and damages, a court can await the outcome of a prior liability trial before deciding how to provide relief to the individual class members."). Therefore, the aforementioned minor complaints can be dealt with in the damages phase if necessary, and it is likely premature to address these issues at this point.

The defendant cites to a number of superficially similar cases in which district courts have denied class certification.

---

715,720 (Mich. 1992) ("There are countless ways to interfere with the use and enjoyment of land including . . . [the] threat of future injury that is a present menace and interference with enjoyment."). Once (and if) nuisance liability has been established, the defendant can contest the degree of harm in the damages phase. Of course, if the nuisance claim becomes unmanageable to adjudicate as a class action, the district court can decertify the class with respect to that claim. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order under Rule 23(c)(1) may be altered or amended before final judgment.").

[6]The defendant is concerned that bifurcation "may deprive [it] of its Seventh Amendment right to a jury trial." Lafarge Br. at 44. Indeed it might. *See, e.g., In re Rhone-Poulenc Rorer, Inc.,* 51 F.3d 1293, 1303 (7th Cir. 1995) (noting that the Seventh Amendment requires that, when a court bifurcates a case, it must "divide issues between separate trials in such a way that the same issue is [not] reexamined by different juries."). On the other hand, if done properly, bifurcation will not raise any constitutional issues. We are confident that the defendant will appropriately raise any concerns with the district court, if the court eventually proposes to bifurcate the case in such a manner as to potentially jeopardize any of its rights. The defendant seems particularly concerned about the Seventh Amendment implications of using a special master to determine individual damages. Lafarge Br. at 44. We suspect that the plaintiffs will be more than willing to have a jury make that determination if that is truly the defendant's preference, however, the parties can bridge that gap when it appears.

We believe these cases are distinguishable, however. The defendant, for instance, relies heavily on *Ramik v. Darling International Incorporated*, No. 98-40276 (E.D. Mich. 1999) (attached to Lafarge Br. at Appx. 2). However, in *Ramik*, it appears the class's primary complaint was noxious odors, which is quite subjective. *Ramik*, No, 98-40276 at 13 ("With respect to damages, defendant points out that the majority of money damages claimed by plaintiffs relates to subjective complaints . . ."). The court in *Ramik* noted that whether the plaintiff will be able to establish liability "will require substantial individual proofs related to the character of the odors at each individual residence." *Id.* at 15. Unlike *Ramik*, in the present case, the plaintiffs' complaints are more objective and experts will likely be able to estimate how much cement dust has fallen over each residence and the potential health effects associated with such quantity of dust.

Similarly, we find *Reilly v. Gould Incorporated*, 965 F. Supp. 588 (M.D. Pa. 1997) to be distinguishable. In that case, the defendant's plant had been closed for more than ten years before the plaintiffs brought suit. *Id.* at 593-94. Therefore, the plaintiffs were not seeking any common injunctive relief (other than a constructive trust for medical monitoring which, at best, is quasi-equitable in nature).[7] *Id.* In contrast, in the present case, the defendant's plant is still operating and the plaintiffs are asking the court to enter a permanent injunction enjoining the defendant from polluting—a conflict particularly suitable for class action adjudication.

---

[7] A number of courts have treated requests for medical monitoring as a form of damage relief. *See, e.g., Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001); *Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520 (N.D. Ill. 1998); *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473 (D.C. Colo. 1998); *O'Conner v. Boeing N. Am., Inc.*, 180 F.R.D. 359 (C.D. Cal. 1997); *Arch v. Am. Tobacco Co.*, 175 F.R.D. 469 (E.D. Pa. 1997); *Harding v. Tambrands, Inc.*, 165 F.R.D. 623 (D. Kan. 1996); *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1400 (W.D. Mo. 1994).

Further, the court in *Reilly* declined to certify the class because it found that individual issues predominated. In large part, this was because the plaintiffs' major complaint was lead poisoning. The court noted the existence of evidence in the record suggesting that the plaintiffs may have been exposed to lead, not just through the defendant's plant or other facilities, but through lead based paint and lead-based gasoline, both of which were in common use during the relevant time period. *See id.* at 604-06. Thus, in order to determine causation in *Reilly,* the fact finder would presumably have had to consider what kind of paint was in each class member's home and the condition of that paint throughout the relevant period, as well as his or her driving and gasoline usage habits. In the present case, it is possible that other facilities caused some of the pollution, but this does not suggest the same level of individual determination required in *Reilly*. We find the other cases cited by the defendant to be distinguishable for similar reasons. Therefore, we believe that the district court did not abuse its discretion by conditionally certifying a Rule 23(b)(3) class.

B.   Rule 23(b)(2) certification

The defendant argues that Rule 23(b)(2) certification is inappropriate because individualized money damages overwhelm the plaintiffs' request for injunctive relief. *See* Lafarge Br. at 45. As we have suggested, we believe that the defendant is overestimating the potential difficulty in establishing a formula for money damages for the class and is underestimating the importance of the injunctive relief. In any case, we do not believe that the defendant's argument makes much sense given that the district court has granted certification under both 23(b)(2) and 23(b)(3).

Disputes over whether [an] action is primarily for injunctive . . . relief rather than a monetary award neither promote the disposition of the case on the merits nor represent a useful expenditure of energy. Therefore, they should be avoided. If the Rule 23(a) prerequisites have

been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed. Those aspects of the case not falling within Rule 23(b)(2) should be treated as incidental. *Indeed, quite commonly they will fall within Rule 23(b)(1) or Rule 23(b)(3) and may be heard on a class basis under one of those subdivisions.* Even when this is not the case, the action should not be dismissed.

7A Charles Alan Wright, Arthur R. Miller, *et al., Federal Practice and Procedure*, 2d. § 1775 (emphasis added); *see also* 5 *Moore's Federal Practice,* § 23.41[6][d] (Matthew Bender 3d. ed.). Therefore, *Coleman*, upon which the defendant relies, is distinguishable because in *Coleman* the district court certified the class *only* under 23(b)(2), not also under 23(b)(3). *See* 296 F.3d at 447. Moreover, injunctive relief was not as critical in *Coleman* because the plaintiffs there, who claimed they were subject to higher finance charges because they were black, were not currently being irreparably harmed in the same way the plaintiffs allege here. *Id.*

Finally, the defendant argues that the requested injunctive relief would cause the court to become unnecessarily and improperly entangled with the ongoing administrative regulation of the plant. Lafarge Br. at 48. The defendant relies on *Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 266-67 (D.D.C. 1990), and several other cases in which district courts declined to certify Rule 23(b)(2) class actions where the plaintiffs were seeking to force automobile recalls. The court in *Walsh*, declined to certify the class, in part, because the court wanted to "avoid entanglement with a regulatory scheme [the National Traffic and Motor Vehicle Safety Act of 1966 (NTMVSA)] designed and intended to empower principally the Department of Transportation, rather than the courts, to order and oversee motor vehicle recalls." *Id.* at

267.[8] The defendant argues that this case is similar because emissions from its plant are regulated by the Clean Air Act, 42 U.S.C. § 7401, and Michigan's Natural Resources and Environmental Protection Act, Mich. Comp. Laws § 324.101. *Id.* However, unlike the NTMVSA, as interpreted by *Walsh*, both of the Acts here expressly contemplate private enforcement suits and the type of injunctive relief sought by the plaintiffs. *See* 42 U.S.C. § 7604(d) (providing for citizen suits and injunctive relief); Mich. Comp. Laws. § 324.1707 (same).[9]

Finally, the defendant is concerned that we might become excessively entangled with other sources of law because of a second amended consent judgement it entered into with the State of Michigan, on September 28, 2000. Appx. at 435. We do not share the defendant's concern. *See, e.g., United States v. Phillip Morris USA*, No. CIV.A.99-2496(GK), 2004 WL 1045766 (D.D.C. May 6, 2004) (finding the existence of a master settlement agreement did not preclude action). The plaintiffs in this case were not parties to the consent judgment, and the agreement itself states that it "does not limit or affect the rights of Lafarge or the State of Michigan against third parties." Appx. at 457. Nothing in the agreement purports to limit the rights of third parties *against* Lafarge either. To the contrary, the agreement states that it "in no way affects Lafarge's responsibility to comply with any other applicable state, federal or local laws or regulations

---

[8] It appears that, at least at the time *Walsh* was decided, no court had ever ordered a recall of an allegedly defective vehicle. *See Chin v. Chrysler Corp.,* 182 F.R.D. 448, 464 n.6 (D.N.J. 1998), citing *In re Gen. Motors Fuel Tank Litig.*, 55 F.3d 768, 811 n. 30 (3d Cir. 1995).

[9] *Walsh* is further distinguishable for the reasons discussed in *Rodriguez v. Carlson,* 166 F.R.D. 465, 476 (E.D. Wash. 1996) (noting that in *Walsh*, the court was "faced with the administration of a nationwide class involving millions" and that the types of violations alleged by the plaintiffs in that case could be fully remedied solely through the award of monetary damages).

[sic], or with any order of this or any other court, including without limitation, any amendments [sic] to Part 55 of Act 451, the federal Clean Air Act ("CAA"), 42 USC 7401, *et seq*, or their rules and regulations, or to the State Implementation Plan." *Id.* at 458. Even if the agreement had purported to limit the rights of third parties, it is unlikely that such a limitation would be upheld, at least absent an allegation or argument that the state was acting in its role as *parens patriae*. *See Lawyer v. Dep't. of Justice*, 521 U.S. 567, 579 (1997) ("[A] settlement agreement subject to court approval in a nonclass action may not impose duties or obligations on an unconsenting party or 'dispose' of his claims.") (citation omitted); *Firefighters v. City of Cleveland*, 478 U.S. 501, 529 (1986) ("[A] court may not enter a consent decree that imposes obligations on a party that did not consent to the decree.") (citations omitted). Of course, if the defendant believed that the class's suit was estopped by the consent judgment, it could have raised this argument in its motion to dismiss or in its answer, as an affirmative defense. *See Blakely v. United States*, 276 F.3d 853, 866-68 (6th Cir. 2002). The defendant chose not to do so, however. *See* Appx. at 30-31, 332-68.[10] Therefore, we need not discuss the issue further.

## III.

## CONCLUSION

In sum, we find that the district court did not abuse its discretion in certifying this class and we are confident that the district court will take appropriate measures if, at any time, it appears that the class threatens to become unmanageable. Therefore, for the reasons discussed *supra*, we find subject

---

[10]The defendant did argue that the existence of the consent judgment suggested that the district court should abstain from hearing the case under the doctrine of *Younger*. Appx. at 360-63. The district court, however, declined to abstain and the issue has not been raised on appeal.

matter jurisdiction to be proper and AFFIRM the district court's grant of class certification.